Andrews, J.
 

 The plaintiff is the owner of a lot on the easterly side of Pearl street in the city of New York, which on the 1st day of December, 1768, was granted by the mayor, aldermen and commonalty of the city to the plaintiff’s predecessor in title by a description which bounded the westerly side of' the lot on Queen (now Pearl) street.
 

 When the grant was made the tidal waters of the East river washed the easterly side of the street, which was coincident with the water line, and the lot granted was then under water. It was subsequently filled in and reclaimed and has been built upon and Pearl street has become one of the important business streets of the city of New York.
 

 The road of the defendant has been constructed in front of plaintiff’s loi^ and this action is brought for damages thereto caused by its construction and operation. Few questions have come before the courts in this generation of greater practical importance or involving larger pecuniary interests than those growing out of the •construction of railways in city streets. Whether such streets may, under legislative and municipal authority, be occupied by railroad tracks to the inconvenience of abutting owners without making compensation and what limitation if any there is to the legislative power over streets which cannot be transgressed without violating the legal and constitutional rights of lot owners are ■questions which have excited the gravest debate and have been the subject of the most careful judicial consideration. Under the ■decisions made there seems to be no longer any doubt in this ■state that streets in a city laid out and opened under charter provisions may under legislative and municipal authority be used for any public use consistent with their preservation as public streets, and this although the use may be new and may seem to impose an additional burden and may subject lot owners to injury. The mere disturbance of their rights of light and access by the imposition of a new street use must be borne and gives no right of action.
 

 
 *878
 
 It is also the law oí this state that the use of a city street for an ordinary horse or steam railway, unless it practically closes the street, is a street use, which may be permitted, and that abutting owners, whose lots are bounded by the side of the street, have no legal redress in the absence of negligence in the construction or operation of the railroad, although it interferes with the enjoyment of their premises or seriously impairs their value.
 
 Fobes
 
 v.
 
 R., W. & O. R. R. Co.,
 
 121 N. Y., 505; 31 N. Y. State Rep., 828.
 

 In the
 
 Story
 
 case, 90 N. Y., 122, three principal questions were considered: (1) whether the appropriation of Front street for the use of the elevated railroad was consistent with the use of the street as an open public street; (2) whether Story, an abutting owner on the street, the fee of which was (as was assumed) in the city, had any property rights in the nature of easements of light, air and access, in and from the street, for the benefit of his adjacent property, which were invaded by the construction of the' road; (3) whether such rights, if they existed, were property within the constitutional provision prohibiting the taking of private property for public use without due compensation.
 

 The decision of the court on the first point, while recognizing the rule that the legislature may authorize the construction and operation of an ordinary surface railroad in a city street, placed its decision against the defendant on the character of the structure, and held that it was destructive of the street uses for which streets, are established. Upon the second point it was held that the plaintiff had easements in the street of light, air and access, appurtenant to his lot, which were affected by the structure of the defendant, impairing the value of his lot. The court, in tracing the origin of his property rights in the nature of easements in the street, placed much stress upon two facts, viz.: The original grant from the city, then the owner both of the land granted and of that which subsequently became Front street, describing the lot granted by reference to a survey and map on which Front street was delineated, and
 
 second,
 
 the express covenant of the city, contained in the grant, that the streets referred to therein should forever thereafter continue to be public streets.
 

 It was decided in respect to the third point that incorporeal rights annexed to property were property within the protection of the constitution and could not be taken or impaired without compensation.
 

 In the
 
 Lahr
 
 case, 104 N. Y., 268 ; 4 N. Y. State Rep., 340, the street upon which the plaintiff’s lot was situated had been opened under the statute of 1813. The decision in the
 
 Story
 
 case left open but one point for discussion, viz., whether lot owners upon streets opened under that statute had similar easements of light, air and access, as those which Story had, although the plaintiff and those under whom he claimed did not derive their title from the city, and had no express covenant such as existed in the case of Story. The court decided that the plaintiff, notwithstanding this difference in the circumstances in the two cases, had easements of the same character as Story. The court regarded the statute of 1813, which permitted the taking by the city of lands;
 
 *879
 
 for streets and the assessing of the cost of improvement upon the property "benefited, taken in connection with the trust declared therein, as equivalent to a contract or covenant by the city with the adjacent lot owners that the streets opened under the statute should forever remain open and public streets, and the consequence was held to follow that they could not be appropriated to other than street uses, to the injury of abutting owners, except upon the condition of making compensation.
 

 The present case presents still another phase of the general question. Pearl street, on which the plaintiff’s lot is situated, was a street prior to 1664, and was opened under the Dutch regime during the Dutch occupation of Manhattan Island. It passed with all the other territory occupied by the Dutch under the control of the crown of Great Britain, upon the capitulation in 1664. There is no evidence in the case of the circumstances attending the opening of Pearl street, or whether the soil forming the bed of the street was, when it was laid out, private or public property.
 

 " The contention of the defendant upon this state of facts in brief is that under the civil law, which was the law of Holland, the sovereign was vested with the absolute title to the soil of all streets and highways within his dominions, and that no private rights or easements existed therein, and that an owner of land adjacent to a street acquired no rights by reason of adjacency, or from the fact that he had built upon the street in reliance upon its continue^ existence, to. have it kept open as a street or way, but that it was competent for the sovereign to close the street, or to convert it to any different public use at any time, without making any compensation to owners of adjacent lands, although by so doing the value of their property might be diminished or even substantially destroyed. The argument following from this premise is that the English crown succeeded to the rights and power of the states general as to all streets laid out under the Dutch occupation^ and that whatever rule may prevail as to streets in the city of Hew York laid out since 1664, the owners of lands abutting on Pearl street have no private rights whatever in the street, and that the legislature has absolute and uncontrolable power to close such street or to convert it to any use, however inconsistent with its use as a street, and that abutting owners would have no remedy whatever.
 

 In the very learned and able brief of the counsel for the defendants many authorities are cited and quotations made from the writings of the civilians in support of their statement of the rule •of the civil law. But assuming the powers of the sovereign under the civil law to be as broad as claimed, and that the English crown succeeded to the same powers as to streets in the city of Hew York opened prior to 1664, as existed in the sovereign under the civil law, it still remains to be considered whether these powers have since been modified as to these ancient streets, by grant or covenant, or legislation or otherwise, so as to vest in abutting owners rights in such streets, in the nature of easements, which before they could not have claimed.
 

 
 *880
 
 In this case the only open question is whether the plaintiff, as-abutting owner, has the right to have Pearl street kept open as a public street, and to the advantages of light, air and access in and from the same, for the benefit of his abutting property, and whether it is distinguishable in principle from the cases heretofore decided. By the Dongan charter, the colonial government granted to the mayor, aldermen and commonalty of the city of New York all the streets in the city for public use. This was in 1686, nearly a century before the grant by the city to the plaintiff’s predecessor in title of the lot now owned by him. In its grant the city bounded the lot on Pearl street The city was then the owner both of the soil of the street and of the land granted. If it was necessary to decide the question, it would be worthy of serious consideration whether, under these circumstances, there was not a grant by implication by the city to its grantee of a right to have Pearl street kept open as a public street for the benefit of the lot granted, within the principle of many of the cases referred to in the
 
 Story
 
 case, that where an owner of land conveys a lot, bounding it on a street laid out by him on his own land, he thereby establishes it as a way for the benefit of his grantee, and his successors in title, which the grantor cannot thereafter close or obstruct to their prejudice. But, as we place our decision on a broader ground than is suggested by these special circumstances, we pass the point without consideration, and shall assume that no covenant was implied in respect of Pearl street, in the grant by the city of the lot in question. The main argument pressed upon om&attention in opposition to the claim that the plaintiff has an easement or property right in Pearl street by virtue of his being an abutting owner merely, is founded on the principle of the common law, that an easement in another’s land must have its origin in grant, or in prescription, which presupposes a grant, and upon the fact that not only is there no evidence of such a grant in this case, but that it having been shown that the street was opened by the Dutch, and presumably governed by the rules of the civil law, the existence of any private right or easement in the street in favor of abutting owners is conclusively disproved.
 

 It is undoubtedly true that there is inseparably associated with the idea of a common law easement the existence of a grant whereby one tenement is subjected to a burden or servitude for the benefit of another, and it must be admitted (upon the assumption we have made as to the construction of the grant of 1768), that the plaintiff’s case is destitute of any proof that the easements or rights which he seeks to enforce originated in grant or in any covenant which operated as a grant between himself, or his predecessors in title, and the city of New York.
 

 The defendant is also entitled to the further admission that if the rights asserted by the plaintiff in Pearl street could only be created in the mode prescribed by the common law for the creation of easements in land, the plaintiff must fail in his action. But, however difficult it is to trace its origin, or to refer it to any exact legal principle, it is undoubtedly the prevailing doctrine of American jurisprudence, that the owner of a lot abutting on
 
 *881
 
 a city street the fee of which is in the municipality, has, by virtue of his proximity, special and peculiar rights, facilities and franchises in the street, not common to the citizens at large, in the nature of easements therein, constituting property of which he cannot be deprived by the legislature, or municipality, or by both combined, without compensation.
 
 Crawford
 
 v.
 
 Village of Delaware,
 
 7 Ohio St., 460;
 
 Street Railway
 
 v.
 
 Cumminsville,
 
 14 id., 524;
 
 Railroad Co.
 
 v.
 
 Esterle,
 
 13 Bush (Ky.), 668;
 
 Lackland
 
 v.
 
 Railroad Co.,
 
 31 Mo., 180;
 
 South Carolina R. R. Co.
 
 v.
 
 Steiner,
 
 44 Geo., 546;
 
 C. B., etc., R. R. Co.
 
 v.
 
 Twine,
 
 23 Kas., 415 ;
 
 Same
 
 v.
 
 Andrews,
 
 30 id., 590;
 
 Theobold
 
 v.
 
 Railroad Co.,
 
 66 Miss., 279;
 
 B. & M. R. R. Co.
 
 v.
 
 Reinhackle,
 
 15 Neb., 279 ;
 
 Haynes
 
 v.
 
 Thomas,
 
 7 Ind., 38;
 
 Rensselaer
 
 v.
 
 Leopold,
 
 106 id., 29.
 

 In several of the cases just cited it was held that the laying of a railroad track in a town or city street, and the operation thereon <?f a steam railroad, was inconsistent with the uses for which streets are established, and in this respect the decisions are more favorable to the abutting owners than those in this state, but this does not weaken their force as an adjudication of the principle that abutting owners have as such a property right in the street in front of their premises, which entitles them to restrain its appropriation to other and inconsistent uses.
 

 The opposite view has been maintained in Pennsylvania, The courts’ of that state have strenuously asserted the supreme power of the legislature to appropriate streets to public uses destructive of their ordinary use as public ways, and have denied the right of abutting owners to compensation, however serious the injury to their property occasioned by such appropriation. The injustice of this rule led to the insertion in the new constitution of Pennsylvania, adopted in 1874, of a provision declaring that municipal and other corporations invested with the privilege of taking private property for public use, should make compensation for property
 
 “
 
 taken, injured or destroyed ’* by the construction of their works, etc. Subsequently, in the case of
 
 Pennsylvania R. R. Co.
 
 v.
 
 Duncan,
 
 111 Pa. St., 352, the court sustained,' under this constitutional provision, an action in favor of an abutting owner on Filbert street in the city of Philadelphia for damages to his premises caused by the construction by the defendant of an elevated track for its road, in the street in front of his premises, which obstructed access thereto, and impaired the value of his property. The
 
 Story
 
 case decided that Story was entitled to relief against a similar structure, on the ground that the injury complained of by him was a taking of his property under the provisions of our state constitution in reference to the taking of private property for public use, which does not contain the words “ injured or destroyed,” as does the similar provision in the Pennsylvania constitution of 1874.
 

 The city of New York has a proprietary interest in the streets of that city. It owns the fee of the land occupied by the streets, whether such streets were laid out under the Dutch regime, or during the colonial period, or subsequently, after the organization.
 
 *882
 
 of the state government. Exit its tenure is in trust for street uses, declared or recognized in the original charters and in the state statutes.
 

 The Dongan charter expressly vested the title to the streets in the mayor, aldermen and commonalty of the city, and the trust was declared in the following words: “ For the public use and service of the mayor, aldermen and commonalty of the said city, and of the inhabitants of Manhattan’s Island and travelers therein.” The Dutch streets, as xvell as all other streets in the city then existing, were included in this grant and were all impressed with and were to be held under the trust so declared. Under the act of 1813, the title to streets laid out and opened under that act also vested in the city, but the statute declared the trust: “In trust, nevertheless, that the same be appropriated and kept open for or as part of a public street, avenue, square or place forever, in like manner as the other public streets, avenues, squares and places in the city are and of right ought to be.” This statute was in precise harmony with the policy indicated by the Dongan charter, to vest the proprietary interest in the streets in this corporation as the donee of a trust for those for whose benefit it was created. The legislature, by the acts of 1779 and 1793, Green. L., 31; 3 id., 54, confirmed and emphasized this policy by a formal investiture of the city with all the rights of the state (if any) in the public streets.
 

 It is to be observed that the declaration of trust in the act of 1813 expressly recognized that all of the streets of the city then existing were held under the same trust as was declared in respect of the streets to be laid out under that act. The words are: “ In like manner as the other streets, etc., in the said city are and of right ought to be.” If the trust declared as to streets to be opened under that act was in legal construction any broader than ihe trust declared in the Dongan charter, then manifestly there was an express legislative declaration in the act of 1813 that the city thereafter was to hold the streets in existence when that act was passed upon the same trust and tenure as the new streets to be opened thereunder. The question then arises, for whose benefit was this trust created. There can be no doubt, of course, that the public at large were beneficiaries.
 

 The streets were to be kept open as public streets forever, and it has always been recognized as one of the primary duties and functions of the state to open and maintain streets and ways as channels for transit, traffic and commerce. But streets, as is well understood, especially in centers of population, subserve the interests of the state in other ways than by affording passage to the public from one point to another. They afford opportunities for erecting wharves and warehouses, stores and dwellings, and public buildings, by public and private enterprise, which contribute to the convenience of the public, and enhance the wealth and prosperity of the state. They encourage the improvement of private property located upon the streets, and as is well known, real property in cities derives its chief value from such location. We think it would be limiting the scope of the trust declared in
 
 *883
 
 the charter and statutes to which we have referred quite unwarrantably to confine it to the aggregate public, and deny its application for the special benefit and protection of property abutting on the streets. This question was reférred to by Judge Tracy in his opinion in the
 
 Story
 
 case. He says (p. 176), “that the trust created by the act of 1813 was intended to be for the benefit of the abutting owner as well as for the public we can not doubt,” and we concur in this view. We have then an express and deliberate legislative declaration of a trust in respect to all the streets owned by the city, however or whenever acquired, that they shall forever be kept open as public streets, upon faith of which owners of abutting property have, or are presumed to have acted in improving and building thereon. Can the legislature abrogate this trust or authorize its violation without making compensation for any injury sustained by abutting owners? Justice requires a negative answer, and we think it may be properly said that the acceptance and acting upon this trust by owners of abutting property creates in them a right which the law will enforce, to have and enjoy the advantages and incidents of a public street in connection with their property, of which the legislature can not'deprive them without compensation.
 

 The statutes for laying out streets proceed on the theory that special advantages are thereby conferred upon and will be enjoyed by the owners of abutting property. In 1793 the legislature by chap. 42 of the Laws of that year authorized the widening of John street and directed that the expense should be apportioned by commissioners who should determine the part to be borne by the city and the part which ought to be borne “ by individual citizens whose estates in the said street and vicinity will become advanced and increased in value by such improvements.”
 

 In 1784 the legislature provided for the alteration of certain streets in the city and provided for damages to individuals whose property should be injured by such alteration. Chapter 56. The system of maintaining, paving and repairing streets and assessing the expense on the adjacent property recognizes the existence in abutting owners of a special and peculiar interest in the streets other than that of the public at large.
 

 The defendants’ counsel in support of the claim that the legislature may deprive abutting owners of the use .of the streets in front of their premises or convert them to other and inconsistent uses, urge the analogy of cases which have arisen in respect of the rights of riparian owners on navigable waters by which, as they allege, it is settled that one whose grant is bounded by high water mark of a navigable stream may under legislative authority be cut off from access to the water without receiving any compensation. The cases of
 
 Gould
 
 v.
 
 Hudson River R. R. Co.,
 
 6 N. Y., 522, and
 
 Lansing
 
 v.
 
 Smith,,
 
 8 Cow., 146, S. C., 4 Wend., 9, are cited in support of the proposition. It is sufficient to say in respect to the case of
 
 Gould
 
 v.
 
 Hudson River R. R. Co.,
 
 that it has been frequently criticized and cannot be regarded as a decisive authority upon the point adjudged therein. The case of
 
 Lansing
 
 v.
 
 Smith
 
 was the case of a public improvement to promote the navigation
 
 *884
 
 of the Hudson river and afford greater facilities for commerce. The improvement was consistent with the use of the river as a highway. In the regulation of this public right the use of the plaintiff’s dock was rendered less convenient but was not prevented. The court held that the act was constitutional. But the chancellor in his opinion expressly reserved the question whether the legislature could grant a right to build a wharf in front of the plaintiff’s so as to destroy it entirely, saying, “that is a question which it is not necessary now to discuss.”
 

 The main question presented on this appeal is difficult of solution. There must be a property right in the street to authorize the maintenance of the action. The plaintiff’s easements or rights in the nature of easements are not created by grant or covenant. They arise, we think, from the situation, the course of legislation, the trust created by statute, the acting upon the faith of public pledges and upon a contract between the public and the property owner, implied from all the circumstances, that the street shall be kept open as a public street and shall not be diverted to other and inconsistent uses. There is some analogy, we think, between the rights of abutting owners as against the public, and those acquired by the public against private persons in streets or highways by dedication. The public acquires, upon acceptance of a dedication by the owner of land of a highway over the same, a perpetual easement therein for a highway, although there may be no deed, or writing, or covenant, and no formalities attending the transaction such as is required for the creation of an easement at common law.
 

 Here the state has dedicated the streets in the city of New York to be public streets. The abutting owners have acted upon the dedication and upon the pledge of the public faith that they shall •continue to be open public streets forever. It would be gross injustice to deprive them of the advantages intended without compensation. The dedication ought to be, and we think is, irrevocable. We conclude this part of the case with the remark that neither the
 
 Story
 
 nor the
 
 Zahr
 
 case imposes any limitation upon the legislative power over streets for street uses. They simply hold that the trust upon which streets are held cannot be subverted by devoting them to other and inconsistent uses. .
 

 We have so far assumed that the fee to the bed of Pearl street was in the Dutch government at the time of the capitulation in 1664. But there is an admission in the case that the fee of a portion of the bed of Pearl street, including that part opposite the plaintiff’s lot, had been granted to individual owners of lots on the opposite side of the street, and that the fee is in their successors in title, of which the plaintiff is not one. The original grants are not in evidence. ' There are some confirmatory grants referred to, made by Gov. Nicolls, which contain a condition that the grantees shall “ not rear any building fabric thereupon, nor debar it (Pearl street) from being a public highway.”
 

 We do not perceive that these grants either weaken the plaintiff’s case or strengthen that of the defendant. The defendant does not claim under the grantees, and if the fee of the street is in pri
 
 *885
 
 vote persons their title is nominal merely and as against them the plaintiff has clearly a prescriptive right, nor could such title prevent the acquisition by the plaintiff and his predecessors of rights against the public in the nature of easements, under the views heretofore stated.
 

 The court allowed the jury to consider the noise created by the trains of the defendant as an element of damage. If the defendant had the lawful right to operate its trains in the street, such inconvenience as might result to the plaintiff in the enjoyment of his property from the ordinary and usual operation of the defendant’s road would not, in the absence of negligence on its part, furnish a ground of action. But we held in the
 
 Lahr
 
 case, that as to abutting owners having easements in the streets through which the road was constructed, whose rights had not been acquired by condemnation, the defendant was a trespasser. Upon general principles, therefore, it would seem that any consequential injury to the plaintiff’s property from the acts of the defendant while engaged in the unauthorized occupation and use of the street, was proper to be considered by the jury. In the
 
 Lahr
 
 case, Ghief Judge Buger, referring to this point, said: “No partial justification of the damage inflicted by an unlawful structure and its unlawful use can be predicated upon the circumstance that under other conditions, and through a lawful exercise of authority some of the consequences complained of might have been produced without rendering their perpetrator liable for damages.” See also opinion of Finch, J.,
 
 Drucker’s
 
 case, 106 N. Y., 158 ; 8 N. Y. State Rep., 599.
 

 The point sought to be raised as to the rule of damages where the premises have been leased by the owner and were in the occupation of a tenant during the period for which damages are claimed, is not, we think, raised by any specific and proper exception and ought not, therefore, to be now determined.
 

 The rejection of evidence as to the diminution of rental value of other buildings near to that of the plaintiff, but not on the line of defendant’s road, if technically erroneous, ought not, we think,
 

 lead to a reversal of the judgment. In the early part of the trial the parties seem to have assented to a rule excluding evidence of this character. It is not at all probable, moreover, that the defendant was harmed by the ruling upon this point.
 

 These views lead to an affirmance of the judgment.
 

 We should have been satisfied to have rested our judgment upon that in the case of
 
 Abendroth,
 
 recently decided in the second division of this court But the present case was originally moved for argument before the
 
 Abendroth
 
 case was finally disposed of in the other branch of the court, and in view of the circumstances and the great importance of the main question involved, we have thought it not inappropriate to express in a supplemental opinion, our concurrence in the judgment in that case.
 

 The judgment below should be affirmed, with costs.
 

 All concur; Earl, J., concurs except as to the rule in reference to noise, and that he thinks erroneous.