ARK. STATE HIGHWAY COMM. *v.* UNION PLANTERS NATL.
BANK.

5-2004                                    333 S. W. 2d 904

Opinion delivered March 28, 1960.

[Rehearing denied May 2, 1960]

·W. R. Thrasher, Bill B. Demmer, for appellant.

Hale & Fogleman, for appellee.

GEORGE ROSE SMITH, J. This is an eminent domain proceeding by which the State Highway Commission seeks to condemn the necessary property rights to enable it to convert an existing highway across the appellees' farm lands into a controlled-access facility. See Act 383 of 1953; Ark. Stats. 1947, Title 76, Ch. 22. In asking the jury for an award of substantial damages the landowners relied mainly upon the fact that their plantation will be effectively cut in two, lengthwise, by the new thoroughfare, since they will be prohibited from crossing it at any point along its three-mile passage over their property. The jury fixed the appellees' compensation at $75,250. In seeking a reversal the Commission's principal contention is that the landowners' right to cross the public right of way had already been taken and consequently the loss of that right is not a compensable element of damage in this case.

The background facts are not in dispute. The appellees' land may be referred to as the Woollard plantation. It contains 2,800 acres and is an irregularly shaped tract whose greatest dimension is its length north and south. Prior to 1952 the land was not traversed by any national highway. In that year the State Highway Commission relocated a portion of U. S. Highway 61 and for that purpose condemned an easement, 250 feet wide, running the length of the Woollard property. The landowners protested that the easement was unnecessarily wide, but we upheld the Commission. *Woollard* v. *Ark. State Highway Comm.*, 220 Ark. 731, 249 S. W. 2d 564. That case was later settled without a trial, and that is the taking now relied upon by the Commission to defeat the principal factor in the appellees' damages.

A controlled-access facility may be broadly described as a superhighway which motorists can enter and leave

only at designated interchanges, usually some miles apart. The 1952 condemnation proceeding was not instituted for the purpose of acquiring a right of way for a controlled-access highway; indeed, Arkansas then had no statute authorizing the creation of such a facility. At that time the Commission planned to construct, and later did construct, a conventional two-lane highway upon the easement it was acquiring. The unusually wide right of way was meant to allow the Commission to add another two lanes sometime in the future, thus providing the customary type of divided thoroughfare with two lanes for northbound traffic and two for southbound traffic.

The proof shows that the original construction pursuant to the 1952 taking did not seriously interfere with the operation of the Woollard plantation. Within the limits of the property the new highway, U. S. No. 61, was crossed at grade by four county roads and by at least four private farm roads. The owners continued to conduct their enterprise as a unit. There is ample proof that the relocation of Highway 61 did not in itself substantially lower the value of the Woollard lands.

Later on, however, this part of Highway 61 was taken into the new interstate highway system. The Highway Commission then filed the present proceeding against the Woollards and others, to the end that the existing highway may be converted into a controlled-access facility. The Commission seeks, first, to acquire the fee simple title that underlies its existing easement, because the statute requires that the State own a limited-access facility in fee. Ark. Stats., § 76-2205. Secondly, the Commission is condemning a little more of the Woollard land, about an acre, which the jury valued at $250. Finally, it was stipulated that the Commission's declaration of taking is "for the acquisition and control of access rights of land adjacent and contiguous to the original highway right of way."

The controlled-access facility, when completed, will consist of four parallel two-lane paved highways. The two double highways in the middle will be one-way routes,

one carrying northbound through traffic and the other carrying southbound through traffic. The outer highways will be two-way service roads, carrying local traffic and affording access to the inner lanes only at the interchanges.

No interchange is to be built within the limits of the Woollard lands. For these landowners and their employees to cross from one side of the plantation to the other they must travel the service roads to and from the nearest interchanges, one being an overpass about half a mile north of the Woollard property and the other being an overpass about equally far south. This bisecting of the plantation will prevent its being operated in the future as a single unit. Additional headquarters must be built, additional machinery must be purchased, and other additional expense must be incurred in operating as two farms what was formerly one undertaking. There is an abundance of substantial testimony, given by qualified expert witnesses, that the Woollards' total severance damages will materially exceed the jury's verdict. Indeed, we emphasize the fact that nowhere in the Highway Commission's brief does it question the amount of the award if the landowners' inability to cross the highway is a compensable element of damage. What the Commission contends is that the jury should not have been permitted to take this severance damage into account at all.

The Commission's argument may conveniently be considered in two separate aspects. First, was the Woollards' right to cross from one side of their property to the other taken *by eminent domain* in 1952? Secondly, if not, can that right be taken in the present proceeding through an exercise of the police power, without compensation to the landowners?

On the first point we think it clear that the Woollards' right to cross the public easement was not within the issues of the 1952 condemnation. If that proceeding had been intended to bisect the Woollard plantation as effectively as if a high stone wall had been erected

down the center of the property it cannot be doubted that the landowners would have been entitled to commensurate severance damages. *St. Louis, Ark. & T. Railroad* v. *Anderson,* 39 Ark. 167; *Ashley, Drew & N. Ry. Co.* v. *Gulledge,* 121 Ark. 143, 180 S. W. 222; *Ark. State Highway Comm.* v. *Speck,* 230 Ark. 712, 324 S. W. 2d 796.

In 1952, however, the Woollards had no reason to anticipate that their commonplace privilege of crossing the State's easement might someday be destroyed by the installation of a controlled-access facility. Our legislature had not then adopted a statute permitting the creation of limited-access highways. We doubt if in 1952 there was anywhere in the entire state a stretch of rural public road as much as a quarter of a mile long, much less three miles long, upon which crossings were prohibited.

The Highway Commission itself has often recognized that after a condemnation an abutting owner whose land has been cut in two still has a right to cross the road. This recognition is quite apparent in those cases in which the Commission has sought to mitigate its liability for severance damages by voluntarily providing the landowner with a means of crossing the new highway. For example, in *Ark. State Highway Comm.* v. *Byars,* 221 Ark. 845, 256 S. W. 2d 738, where a relocation of Highway 64 divided the land into two tracts, the opinion observed: "The Highway Department . . . agrees to build an underpass under the right-of-way whereby livestock can be moved from the severed 55 acres south of new 64." In a similar situation we remarked in *Ark. State Highway Comm.* v. *Dupree,* 228 Ark. 1032, 311 S. W. 2d 791: "According to the undisputed evidence the Highway Commission will provide a grade crossing."

It is plain enough that in the *Byars* case the Commission would not have been permitted to reduce its liability by providing an underpass and then later on contend that it had already acquired by eminent domain (as distinguished from the police power) the right to close

that underpass. So in the Woollard case. In 1952 the Woollards could not have successfully asserted their present claim, for there were available after the taking four public crossings and at least that many private crossings. In negotiating with the Woollards the Highway Commission was entitled to rely upon those crossings to reduce its liability to the landowners. It cannot now take the inconsistent position that the Woollards' right to cross the highway was bought and paid for in 1952.

We may add the observation that, had the present claim been asserted in the 1952 proceeding, the claim not only *would* have been disallowed but also *should* have been disallowed. There was then no substantial basis for supposing that the Woollards' right to cross the public easement would ever be disputed. If they had been entitled to recover compensation upon the theory that their plantation was being effectively cut in two by a conventional highway, the judgment in their favor would have been a precedent exposing the State to similar speculative and even fictitious claims in every case in which the Commission condemned a right of way across a tract of land. It seems clear that such a holding would be neither legally sound nor in the public interest.

The second aspect of the Commission's argument is more perplexing. Here it is contended that after the State has acquired a highway easement, and especially one 250 feet wide, it is entitled to put into effect, without compensating an owner whose land bestrides the highway, a traffic regulation which prevents any person from crossing the public right of way except at specified interchanges.

For the most part the authorities cited by the Commission do not reach the present situation, for they involve land lying entirely on one side of the street or highway. It is settled that in that situation the public authorities may erect a median strip down the center of the thoroughfare or may in some other manner prohibit left turns or two-way traffic without compensating the

abutting landowner for his inconvenience or for the loss of business that results from the change in the flow of traffic. *City of Fort Smith* v. *Van Zandt,* 197 Ark. 91, 122 S. W. 2d 187; *Holman* v. *State,* 97 Cal. App. 2d 237, 217 P. 2d 448; *People* v. *Sayig,* 101 Cal. App. 2d 890, 226 P. 2d 702; *Dougherty County* v. *Hornsby,* 213 Ga. 114, 97 S. E. 2d 300; *Langley Shopping Center* v. *State Roads Comm.,* 213 Md. 230, 131 Atl. 2d 690; *Turner* v. *State Roads Comm.,* 213 Md. 428, 132 Atl. 2d 455; *Muse* v. *Miss. State Highway Comm.,* 233 Miss. 694, 103 So. 2d 839; *Brady* v. *Smith,* 139 W. Va. 259, 79 S. E. 2d 851. This general principle is also being applied by us in another case decided today, *Ark. State Highway Comm.* v. *Bingham,* 231 Ark. 934, 333 S. W. 2d 728, wherein we are holding that a loss attributable merely to the diversion of traffic is not compensable. We find three cases involving tracts on opposite sides of the highway, but these decisions are readily distinguishable on the facts and need not be discussed. *Iowa State Highway Comm.* v. *Smith,* 248 Iowa 869, 82 N. W. 2d 755; *Warren* v. *Iowa State Highway Comm.,* 250 Iowa 473, 93 N. W. 2d 60; *Carazalla* v. *State,* 269 Wis. 593, 70 N. W. 2d 208, rehearing granted, 270 Wis. 593, 71 N. W. 2d 279.

It is quite apparent that the doctrine of the cases cited, involving land on only one side of the highway, would have to be materially extended to reach the situation now before us. In that event it would be necessary to determine whether the exercise of the police power was being carried so far as to amount to a taking of private property. As the court pointed out in the leading case of *Pennsylvania Coal Co.* v. *Mahon,* 260 U. S. 393: "The general rule at least is, that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking. . . . We are in danger of forgetting that a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change."

We do not reach this question, however, for we are convinced that in the case at bar the State is actually exerting its power of eminent domain. It thus becomes unnecessary for us to decide whether the same result might constitutionally be attained through the exercise of the police power alone, without payment to the landowner.

To begin with, the controlled-access highway statute contemplates a taking, for it specifically provides that the State's right of way must be owned in fee simple. Ark. Stats., § 76-2205. Of course the legislature knew that an existing easement could not be enlarged to a fee by means of a mere police regulation, and there is no good reason to suppose that the legislature meant to divide the transaction into two steps, one involving the police power and the other the power of eminent domain.

The particular situation now before us will evidently arise very infrequently in Arkansas, for only in rare instances will the State own a highway easement that is sufficiently wide to accommodate a controlled-access facility and that is also so located as to be suitable for that use. In the usual case the Highway Commission will be compelled to condemn a new right of way for this type of highway, and in such an original proceeding it goes without saying that a landowner whose land is cut in two will be entitled to compensation for his loss. The fact that the legislature did not authorize the Highway Commission to convert an existing easement into a controlled-access facility even when that could be accomplished demonstrates that some importance was attached to the acquisition of the fee simple.

In the second place, when the arguments on each side are fairly well balanced considerations of equity and justice are entitled to great weight. Here the equities undeniably lie with the landowners. It is nowhere denied that they have suffered an actual pecuniary loss at least equal to the jury's award. As we have seen, they could not have asserted their present claim in 1952, for the division of their property was not then contemplated. If

their cause of action is denied they will have been deprived of any opportunity to assert a just claim. Yet all that has happened in the meantime has been the passage of federal laws creating an interstate system of limited-access highways. Public Law 627, June 29, 1956, 70 Stat. at Large 374; 23 U. S. C. A. § 111. If the Woollards' land had been taken after the adoption of the federal law instead of before its passage their damages would unquestionably have been paid. In the absence of a clear expression of the legislative intent we are unwilling to read into our controlled-access highway statute a requirement that these particular appellees must bear a unique burden, a burden that other landowners will escape simply because their property happened to be taken at a more favorable moment.

The Commission's remaining points do not require extended discussion. We see no real objection to testimony by which an expert witness gave his "personal" opinion about land values; the opinion of any expert is of course personal to that witness. Nor do we think the Commission was prejudiced by the fact that Mr. Woollard mentioned in the course of his testimony that the county had discontinued its maintenance of a bridge.

There is merit, however, in the appellant's contention that the fees of the appellees' expert witnesses, amounting to $1,280.00, should not have been taxed as costs in the case. The allowance of costs is purely statutory, and in the absence of a statute the fees of expert witnesses cannot be charged against the losing party. *Ark. Game & Fish Comm.* v. *Kizer*, 222 Ark. 673, 262 S. W. 2d 265; 38 A. L. R. 2d 1372. This modification of the judgment amounts to a substantial recovery and thus entitles the appellant to recover its costs of appeal. Supreme Court Rule 24.

Modified and affirmed.

McFADDIN and JOHNSON, JJ., concur.

HOLT and ROBINSON, JJ., dissent.

SAM ROBINSON, Associate Justice, dissenting. The majority does not cite a single authority that sustains the view expressed, although there is an abundance of literature and cases on the subject involved, including splendid Law Review articles such as: Cunnyngham, The Limited-Access Highway from a Lawyer's Viewpoint, 13 Mo. L. Rev. 19; Controlled Access Highways in Iowa, 43 Iowa L. Rev. 258; Covey, Control of Highway Access, 38 Nebr. L. Rev. 407; Clarke, The Limited-Access Highway, 27 Wash. L. Rev. 111; Covey, Highway Protection Through Control of Access and Roadside Development, 1959 Wisc. L. Rev. 367. None of the Law Review articles supports the position taken by the majority, and there are no cases sustaining that view.

In my opinion the only thing acquired by the State in this action, in addition to the one acre valued at $250, is the fee in the right of way, in which the State already had a right of way easement. In a case of this kind the fee has a nominal value only. *People* v. *Sayig,* 101 Cal. App. 2d 890, 226 P. 2d 702. In 1952 Woollard was paid for the 250-foot right of way across his property. *Woollard* v. *State of Ark. Highway Dept.,* 220 Ark. 731, 249 S. W. 2d 564. It will be seen from the decision in that case that there was taken into consideration, among other things, the fact that the Highway Department contemplated building a modern highway of such dimensions and character that Woollard would be precluded from crossing it at any place except the points designated and prepared by the Highway Department for that purpose. When the right of way was taken by the State, Woollard lost all interest in the land embraced within the right of way except the fee, which is of no practical value, and the right of access, and he still has access to the right of way. In the first *Woollard* case, this Court said: "Even though the Commission's existing commitment is to construct only a 24-foot two-lane highway, its plan for the future, when justified by available funds, is to build a second two-lane road, separated from the first by a parkway that will provide earth for the necessary fills and also promote the public safety by dividing the two arteries of traffic. By

acquiring a sufficiently broad right-of-way in the first instance the Commission expects to avoid the expense that is incident to any attempt to enlarge a roadbed that has been hemmed in by the various commercial establishments that tend to spring up along the border of a public highway.''

Woollard should not be compensated more than once for the taking of the right of way. In the case of *Arkansas State Highway Commission* v. *Fox*, decided March 23, 1959, 230 Ark. 287, 322 S. W. 2d 81, this Court said: ''Unquestionably a landowner is entitled to be fully compensated for his loss under the processes of eminent domain. However, we have established methods by which a determination of 'just compensation' is to be made. In a situation as the case at bar where there is a partial taking of a landowner's property we have established the rule that the measure of damages is the difference between the value of the whole land before the appropriation and the value of the portion remaining after the appropriation. *Pulaski County* v. *Horton*, 224 Ark. 864, 276 S. W. 2d 706 (1955); *Herndon* v. *Pulaski County*, 196 Ark. 284, 117 S. W. 2d 1051 (1938); *Newport Levee District* v. *Price*, 148 Ark. 122, 229 S. W. 12 (1921).

''In spelling out this rule we said in *Little Rock, Mississippi River and Texas Railway Co.* v. *Allen*, 41 Ark. 431 (1883): 'The correct rule for measuring damages is to determine the value of the whole land without the railway at the time same was built, then find the value of the portion remaining after the railway is built, and the difference between the two estimates will be the true compensation to which the party owning the land is entitled.' ''

In the case of *Keith* v. *Drainage Dist. No. 7 of Poinsett County*, 183 Ark. 384, 36 S. W. 2d 59, the Court quoted with approval the rule laid down in *Newgass* v. *Railway Co.*, 54 Ark. 140, 15 S. W. 188, that the value of private property taken for public use must be determined as of the date a petition for condemnation is filed. In the case at bar the petition was filed and the right of way was taken back in 1952. Every element that can fairly enter into the

question of market value and which a business man of ordinary prudence would consider before purchasing property should also be considered by the jury in arriving at the value of the property before and after the taking. *Pulaski County* v. *Horton*, 224 Ark. 864, 276 S. W. 2d 706. And in *Little Rock, Mississippi River and Texas Railway Co.* v. *Allen*, 41 Ark. 431, this Court said that the measure of damages for the right of way taken by a railroad company across a city or town lot is the difference between the value of the whole land without the road at the time it was built and the value of the portion remaining after it was built; and in estimating this value the jury should consider *all present and prospective* actual damages resulting to the owner from the prudent construction and operation of the road, the effect the road would have in decreasing the value of the land for gardening purposes, as well as *inconveniences caused by embankment, excavations, ditches and obstruction to the free egress and ingress of the premises.*

And in *Little Rock and Ft. Smith Railroad Co.* v. *Greer*, 77 Ark. 387, 96 S. W. 129, the Court said: "It is a well-established rule of law that the owner of land taken for railroad purposes is entitled, before or at the time of the taking, to compensation for all damages, *present and prospective,* which he sustains by reason of the construction of the railroad . . . Such damages include the value of that part of the land which is taken, as well as the damages consequent upon such taking to the residue. *The doctrine invoked by appellant has its rationale in the presumption that, in the absence of proof to the contrary, the owner who is entitled to such compensation received same before or at the time his land was charged with the servitude; that this was considered and settled when the owner conveyed the land to the railroad or when the railroad acquired its title by condemnation; . . .*" [Emphasis supplied] On rehearing Judge McCulloch said: "The principle is made clear in the original opinion that where a railroad corporation lawfully acquires a right of way over land, either by grant, prescription or condemnation, such acquisition *covers all damages, present and prospective, resulting to the owner whose land is invaded.*

*This upon the theory that full compensation is allowed at the time, and can be recovered only once."* [Emphasis supplied] Thus, according to the law of this State, as heretofore announced by this Court, the presumption is that Woollard, the landowner, was paid full value for the right of way in 1952.

Of course, Woollard was damaged by the severance of his place, but that damage was paid for in 1952. In the case at bar the landowners are being allowed compensation on the theory that their plantation is being effectively cut in two. The answer to that theory is that it was cut in two by the first taking in 1952, when 98 acres were taken. The one acre taken at this time certainly does not cut the 2,800 acre plantation in two. In 1952 it was known that the highway would sever the plantation, and witnesses so testified in the first case, and it was shown that the kind of road to be constructed would prevent the crossing of the right of way except at points designated by the Highway Department. The fact that such a right of way would be constructed is pointed out in the first *Woollard* case above mentioned.

To sustain its view, the majority cites *Arkansas State Highway Commission* v. *Byars,* 221 Ark. 845, 256 S. W. 2d 738, and *Arkansas State Highway Commission* v. *Dupree,* 228 Ark. 1032, 311 S. W. 2d 791. But those two cases do not support the majority's contention. It is clearly recognized in those cases that the property owner had the right to recover damages for the severance of his property, and the question was whether the damages allowed in the trial court were excessive. It was pointed out in those two cases that the fact that the Highway Department was providing facilities for the property owners to cross the right of way had a tendency to mitigate the damages at that time, the time of the taking. There is nothing in either of those cases which indicates that the property owner can come into court several years after the taking and recover damages because he is unable to cross the highway at any place he might wish to cross it. The majority mentions that county roads crossing the right of way will be closed.

But this Court has held time and again that a property owner cannot recover damages because a right of way has been changed or closed. See *Risser* v. *City of Little Rock*, 225 Ark. 318, 281 S. W. 2d 949, and cases cited therein.

By purchasing the 250-foot right of way across the Woollard land in 1952, the State acquired the valid right to construct four strips of concrete pavement, or any other number of such strips, on such right of way. In the case of *Muse* v. *Mississippi State Highway Commission*, 233 Miss. 694, 103 So. 2d 839, 847, the court said: ''Land condemned for highway purposes without limitation as to surface use is at all times under the control of the highway authorities, which may make such use of the land as may be required; and the abutting landowner's right of access and user are subject to the right of the state under the police power to regulate and control the traffic on the highway in the interest of safety, and to restrict in a reasonable manner entrances from abutting property.'' In *Jones Beach Blvd. Estate* v. *Moses*, 268 N. Y. 362, 197 N. E. 313, 315, the court, in discussing the rights of an abutting landowner to an easement of access in a public highway and the right of the state to regulate and control traffic on the public highways, said: ''The rights of an abutter are subject to the right of the state to regulate and control the public highways for the benefit of the traveling public. *Sauer* v. *City of New York*, 180 N. Y. 27, 72 N. E. 579, 70 L. R. A. 717; *Ryan* v. *Preston*, 59 App. Div. 97, 69 N. Y. S. 100. See *Perlmutter* v. *Greene*, 259 N. Y. 327, 182 N. E. 5 [81 A. L. R. 1543]; *Kane* v. *New York El. R. Co.*, 125 N. Y. 164, 176, 26 N. E. 278, 11 L. R. A. 640. Cf. *Miller* v. *State*, 229 App. Div. 423, 243 N. Y. S. 212; *Farrell* v. *Rose*, 253 N. Y. 73, 170 N. E. 498, 68 A. L. R. 1505. Although the abutting owner may be inconvenienced by a regulation, if it is reasonably adapted to benefit the traveling public, he has no remedy unless given one by some express statute.''

The State has the authority to regulate the traffic and prevent Woollard or anyone else from moving automobiles, trucks and heavy farm implements across the

right of way except at certain places where the access is controlled in order to protect the traveling public from the hazards that would be present if such equipment were permitted to cross at just any place, day or night. The abutter's right of access is subject to the superior public interest. In the Wisconsin case of *Neenah* v. *Krueger,* 206 Wis. 473, 240 N. W. 402, the court said: "However, this right [the abutter's right of access] is, in common with most other rights, subject to reasonable regulations in the public interest and for the promotion of public convenience and safety."

The State has the right under the easement obtained in 1952 to build a modern highway and control the traffic thereon and did not acquire any additional rights in that respect by virtue of acquiring the fee in 1959. Ark. Stat. § 76-201.5 provides: "The Commission [Highway Commission] shall be vested with the following powers and shall have the following duties: . . . (m) To adopt reasonable rules and regulations from time to time for the protection of, and covering, traffic on and in the use of the State Highway System and in controlling use of, and access to, the highways . . ." Under this statute the Commission can certainly adopt rules against left-hand turns, U-turns, and crossing the highway except at designated points. In addition, by virtue of its police power the State has such authority. *Carazalla* v. *State of Wisconsin,* 270 Wis. 593, 71 N. W. 2d 276. In *Muse* v. *Mississippi State Highway Commission,* 233 Miss. 694, 103 So. 2d 839, 847, the court said: "As the problem of regulating motor vehicle traffic on the highways has become more and more complex, new standards of design for highway construction have been adopted by the highway authorities to reduce the hazards of travel and expedite the flow of traffic. . . . Multiple lane highways have been constructed in all parts of the country; and median strips or neutral zones between lanes of traffic on multiple lane highways, with interchanges or crossovers at reasonable intervals to enable motorists to pass from one traffic lane to another, have been authorized and provided for in the standards of design adopted for the construction of

such highways. Such median strips or neutral zones provide for a complete separation of traffic moving in opposite directions, and reduce the hazards incident to motor vehicle travel; and the establishment of such median strips or neutral zones have been recognized as a proper exercise of the police power. *Rand v. Mississippi State Highway Commission,* 191 Miss. 230, 199 So. 374; *Commonwealth v. Nolan,* 189 Ky. 34, 224 S. W. 506, 11 A. L. R. 202; *Jones Beach Blvd. Estate v. Moses, supra* [268 N. Y. 362, 197 N. E. 313, 100 A. L. R. 487]; *City of Fort Smith v. Van Zandt,* 197 Ark. 91, 122 S. W. 2d 187; *Impagliazzo v. Nassau County, Sup.,* 123 N. Y. S. 2d 819.''

It will be recalled that in the first Woollard case a 250-foot right of way was taken by the State. Among other things, Woollard contended that a right of way of that width was not needed. In pointing out that a 250-foot right of way was not of an excessive width, this Court said: ''It is evident that the present undertaking would not be necessary had the State taken a sufficiently wide easement when the road from Marion to Turrell was originally laid out. In these circumstances it is certainly permissible to look ahead in its planning.'' *Woollard v. State, supra* [220 Ark. 731, 249 S. W. 2d 564].

There are four concrete strips on the right of way. Woollard has complete and full access to the two outside strips. He may move his vehicles onto these two strips at any point he so desires, and travel in either direction to controlled points, where he can cross the two center concrete strips with safety to himself and others. I don't see how anyone can read the first *Woollard* case and say it was contemplated that the landowner would have the right to cross the two center strips, when constructed, at any place other than controlled points. The opinion clearly states that it was planned to build a parkway down the middle of the two strips from which dirt would be taken to be used as fills for the concrete strips. There is nothing to indicate that a vehicle would be able to cross this parkway. It was to be put there to separate the lanes of traffic and make the highway safe.

According to the great weight of authority, and the majority has cited no authority to the contrary, *Woollard* has not been denied access to the system of highways, and he is entitled to nothing more. *Department of Highways* v. *Jackson,* 302 S. W. 2d 373. He does not have the right to cross the highway with his equipment at any point he may choose. *Turner* v. *State Roads Commission,* 213 Md. 428, 132 A. 2d 455; *Dougherty County* v. *Hornsby,* 213 Ga. 114, 97 S. E. 2d 300; *Brady* v. *Smith,* 139 W. Va. 259, 79 S. E. 2d 851. In the last cited cases the highways were divided into traffic lanes with a physical barrier between them, which allows the abutter to travel in only one direction when leaving his property. Our own case of *City of Fort Smith* v. *Van Zandt,* 197 Ark. 91, 122 S. W. 2d 187, is to the same effect. When once on the highway an abutter's rights are no more nor less than any other user of the highway. *Jones Beach Blvd. Estate* v. *Moses,* 197 N. E. 313; *Dougherty County* v. *Hornsby,* 97 S. E. 2d 300.

In the case of *Turner* v. *State Roads Commission,* 213 Md. 428, 132 A. 2d 455, the court quoted from *Langley Shopping Center, Inc.* v. *State Roads Commission,* 213 Md. 230, 131 A. 2d 690, 693, as follows: " 'It seems to us entirely reasonable that if the State could divert traffic entirely away from the plaintiffs' corners without being liable for damages for doing so, it may, in the interest of safety, and without incurring liability for damages, interpose an obstacle which may render access to the plaintiffs' properties less easy but which does not actually or virtually destroy the plaintiffs' access to the highway. *An opposite view would require the State to pay through the nose for the privilege of further improving and adding to the safety of highways which it has built* . . .' " [Emphasis supplied]

In *Warren* v. *Iowa State Highway Commission,* 250 Iowa 473, 93 N. W. 2d 60, it was held that where a farmer's home place and a 40-acre tract on a secondary road were located to the east of a national interstate and defense highway and her slightly larger tract used as a part of the same farming operation was located west of said highway

on the same secondary road, and the closing of the secondary road on either side of the highway required the farmer to travel a circuitous route over three miles in length to go from her home place to the other tract instead of a direct one-quarter mile route over the secondary road, and the farmer's right of access to the secondary road was not affected and she had the same means of ingress and egress thereto as she had prior to the closing, farmer had no special damages and her injury, though greater in degree, was the same in kind as that suffered by the general public and was not compensable.

In *Carazalla* v. *State of Wisconsin,* 270 Wis. 593, 71 N. W. 2d 276, the court said, in discussing limited access highways and their effect upon abutting property owners: "If the abutting landowner's access to the highway is merely made more circuitous, no compensation should be paid." To the same effect is the case of *Holman* v. *State,* 97 Cal. App. 2d 237, 217 P. 2d 448, where the court said: "The facts pleaded herein show that the highway upon which plaintiffs' property abuts is not closed and that plaintiffs, once on the highway to which they have free access, are in the same position and subject to the same police power regulations as every other member of the traveling public. Because of a police power regulation for the safety of traffic, they are, like all other travelers, subject to traffic regulations. They are liable to some circuity of travel in going from their property in a northerly direction. They are not inconvenienced whatever when traveling in a southerly direction from their property. The re-routing or diversion of traffic is a police power regulation and the incidental result of a lawful act and not the taking or damaging of a property right. . . .

"If the contention of the plaintiffs herein is sustained, the right of the State to control the traffic as a safety regulation would be definitely curtailed and traffic islands or double lines in the highway to separate through traffic would be prohibited. The damage of which plaintiffs complain would be the same if no division strip had been constructed on the highway in question but that double white

lines had been painted on the highway and a 'no left turn' sign had been erected, or if the entire highway had been designated as a one-way street."

In accord is *People* v. *Sayig, supra* [226 P. 2d 702].

Mere circuity of travel is not cause for damages. *State* v. *Linzell,* 126 N. E. 2d 53; *People* v. *Schultz Co.,* 268 P. 2d 117; *Blumenstein* v. *City,* 299 P. 2d 347; *State* v. *Fox,* 332 P. 2d 943.

For all practical purposes, *Iowa State Highway Commission* v. *Smith,* 248 Iowa 869, 82 N. W. 2d 755, is directly in point with the case at bar. The Smiths owned property on both sides of Hubbell Avenue; their business was on one side of the street and their home was on the other. A controlled access highway was constructed and the property owners could no longer cross directly from their home to the place of business. The court said (p. 758): "Heretofore defendants could cross Hubbell Avenue by motor vehicle between their home and business properties by driving from 500 to 600 feet. When the contemplated highway improvement is made they may cross only at East 38th or 42d Street. The increased distance in traveling from their home to place of business and back again will approximate a mile. In the future the residence property may be entered from the highway only when going east and upon leaving one must drive east as far as 42d Street. West bound travelers desiring to enter the residence property will be required to go west to 38th Street, make a U turn there and go back east to the driveway." In holding that the property owners suffered no compensable damages, the court said (p. 761): "We have no difficulty in disposing of defendants' appeal from the part of the judgment holding the prohibition of crossing the highway, left turns and U turns except at designated points where there are no raised 'jiggle' bars does not constitute a taking of defendants' property within the law of eminent domain. The law on this phase of the controversy seems to be thoroughly settled by many recent decisions and the judgment must be affirmed on defendants' appeal." Among the many cases cited by the court in support of its

conclusion is *City of Fort Smith v. Van Zandt,* 197 Ark. 91, 122 S. W. 2d 187.

And finally we come to our case of *Arkansas State Highway Commission* v. *Bingham,* which is being handed down the same day as the case at bar. In my opinion the two cases are in hopeless conflict. Mrs. Bingham owned valuable property. By reason of the construction of controlled access facilities, the value of the property was greatly depreciated. In that case this Court is holding that according to the great weight of authority, including decisions of this Court, Mrs. Bingham and her tenants have suffered no compensable damages. The decision in the Bingham case is sound and is supported by practically all of the authority on the subject. But in the case at bar, where *Woollard* has suffered damages because of the construction of controlled access facilities, he is permitted to recover a large sum as damages. (Woollard has suffered small damages compared to those suffered by Mrs. Bingham and her tenants.) There is no valid distinction between the two cases. Woollard is damaged because he cannot cross the center strip of the highway except at controlled points. Mrs. Bingham is damaged because people who would ordinarily patronize her service station cannot leave the center strip except at controlled points. In fact, there is a great deal more merit to Mrs. Bingham's claim for damages than there is to the claim of Woollard. Woollard was actually paid for the damages he sustained by reason of the severance of his place. The law presumes that he was paid in full for all damages sustained. Mrs. Bingham has been paid nothing for the loss she has sustained by reason of the access facilities preventing the traveling public from conveniently reaching her property.

In the *Bingham* case to sustain the conclusion reached there are cited the cases of *City of Fort Smith* v. *Van Zandt,* 197 Ark. 91, 122 S. W. 2d 187; *Muse* v. *Mississippi State Highway Commission,* 103 So. 2d 839; *State* v. *Linzell,* 126 N. E. 2d 53; *State* v. *Fox,* 332 P. 2d 943; and *Blumenstein* v. *City,* 299 P. 2d 347. I submit that all of those cases support the view I have expressed in this

dissent and do not sustain the finding of the majority in the case at bar.

In referring to what it would mean to sustain the same kind of contention that Woollard, the landowner, makes in the case at bar, Clarke on The Limited-Access Highway, *supra* [27 Wash. L. Rev. 111], says: "It would mean in effect that every abutter could demand an opening through the central median or dividing strip both between the outer highway and the through-traffic lanes, and through the center dividing strip of the through lanes. It is obvious that such concession to abutters would defeat the underlying purpose of the limited-access facility. Yet the only alternative under such a rule of law is payment of . . . tribute by the public to adjacent owners. This tribute could be so great in the aggregate that the cost of freeways would, in fact, be prohibitive." And Covey on, Highway Protection Through Control of Access and Roadside Development, *supra* [1959 Wisc. L. Rev. 567, 581], has this to say: "Further, as a matter of practice, if the state must build a service road and compensate the abutter for being placed on it, the highway commission will not build such auxiliary facilities." As it now stands, the Highway Department can hardly hope to build a modern highway system because of the large damages it will have to pay to every property owner who has had his property severed and is prevented from crossing the right of way at just any point he may choose, and it is fairly certain that in other cases the cost will be heavy, as it is in the case at bar.

For the reasons set out herein, I respectfully dissent.