IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| JOSHUA DRIGGS, a single man, | ) | |
| | ) | No. 32381-1-III |
| Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ANDREW T.G. HOWLETT, M.D. and | ) | ORDER WITHDRAWING |
| JANE DOE HOWLETT, and their marital | ) | OPINION |
| community, PROVIDENCE PHYSICIAN | ) | |
| SERVICES CO. aka Providence | ) | |
| Orthopedic Specialties, a Washington | ) | |
| Corporation, | ) | |
| | ) | |
| Respondents. | ) | |

THE COURT on its own motion finds that the Opinion filed March 8, 2016, and the

Order Granting Motion to Publish in Part filed May 5, 2016, should be withdrawn:

THEREFORE, IT IS ORDERED, the Opinion filed March 8, 2016, and the Order

Granting Motion to Publish in Part filed May 5, 2016, are hereby withdrawn and a new

opinion will be filed this day.

PANEL: Judges Fearing, Korsmo, Siddoway

FOR THE COURT:

GEORGE B. FEARING, Chief Judge

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| JOSHUA DRIGGS, a single man, | ) | |
| | ) | No. 32381-1-III |
| Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ANDREW T.G. HOWLETT, M.D. and | ) | OPINION PUBLISHED IN PART |
| JANE DOE HOWLETT, and their marital | ) | |
| community, PROVIDENCE PHYSICIAN | ) | |
| SERVICES CO. aka Providence | ) | |
| Orthopedic Specialties, a Washington | ) | |
| Corporation, | ) | |
| | ) | |
| Respondents. | ) | |

FEARING, J. — This appeal primarily asks us to address conditions precedent to a medical expert rendering opinions during a medical malpractice trial. The trial court excluded opinions of plaintiff Joshua Driggs' foremost medical expert because the physician did not commit, when asked, to base opinions on reasonable medical probability, because he testified to a national standard of care, because he conceded in cross-examination that his opinions were personal, and because he did not provide a percentage for the increased risk of a fracture resulting from the lack of fixation for an allograft. We agree with Driggs that the trial court committed harmful error, and we remand for a new trial.

FACTS

Joshua Driggs sues Providence Physician Services and its employee, Dr. Andrew Howlett. We refer to the respondents collectively as Providence Physician Services or Providence.

Appellant Joshua Driggs asserts errors during the course of trial. Therefore, we briefly outline the facts in this section of the opinion and later provide extended details of the facts when reviewing trial rulings. Joshua Driggs limits his suit for medical malpractice to claims of negligence by two employees of Providence Physician Services, Orthopedist Andrew Howlett and Physician's Assistant Brandi DeSaveur, during 2009. The story of Driggs' medical care begins earlier.

In 2004, health care professionals diagnosed fifteen-year-old Joshua Driggs with osteosarcoma above the ankle in his right distal tibia. Osteosarcoma is a common form of bone cancer in children. Instead of amputating the leg, Dr. Ernest Conrad removed the cancerous fragment of the bone and inserted an allograft, or bone segment from a cadaver. Dr. Conrad attached the allograft to the remaining tibia by screwing a metal plate to the tibia and allograft. The plate supports the allograft because the cadaver bone lacks the strength of a living bone. The metal plate is called fixation or hardware and serves as a support for the allograft. In this suit, Joshua Driggs and his experts promote the need of fixation to an allograft.

The cadaver bone inserted into Joshua Driggs' tibia extended six and a one-half

2

centimeters, which equates to three and one-half to four inches. Driggs' surgeon, Dr.

Ernest Conrad, would not remove the metal plate from a patient's allograft without

substituting another plate or other form of fixation unless the graft is "very small" and

has vigorous growth around it. Conrad defines "very small" in this context as "four or

five centimeters or smaller." Clerk's Papers (CP) at 1552.

Although properly aligned initially, Driggs' allograft later twisted and required

additional surgery. In January 2006, Dr. Andrew Howlett, of Providence Physician

Services, assumed care of Joshua Driggs' right leg. In January 2006, Dr. Howlett

performed an ankle fusion and osteotomy on Driggs to correct malalignment in the leg,

improve mechanics in the foot, and decrease arthritic pain. In November 2006, Dr.

Howlett performed another surgery to alleviate pain in the ankle caused by two screws.

In January 2008, Joshua Driggs' right ankle pain returned. Dr. Andrew Howlett

discussed with Driggs another surgery to remove the plate inserted by Ernest Conrad and

replace it with an intramedullary rod. A rod may substitute for a plate in supporting the

allograft. According to Howlett, he discussed with Driggs, before the surgery, the

possibility of not replacing the plate with a rod, because of deleterious effects of a rod.

An intramedullary rod runs through the inside of the bone, and the rod's installation

requires destruction of existing allograft and live bone.

During a March 6, 2009 surgery, Dr. Andrew Howlett removed the plate and

screws from Joshua Driggs' cadaver bone. Dr. Howlett did not replace the plate with an

3

intramedullary rod. Driggs claims Dr. Howlett violated the standard of care by failing to install fixation and breached his right to informed consent by failing to explain the risk to him of the omission of fixation.

After the March 2009 surgery, Joshua Driggs underwent physical therapy, but continued to suffer pain and swelling. In May, while crossing his yard, Driggs experienced a shooting pain in his right leg.

On May 27, 2009, Joshua Driggs visited Dr. Howlett's office at Providence Physician Services and met with Physician's Assistant (PA) Brandi DeSaveur. Driggs reported the increased pain and swelling to DeSaveur. PA DeSauver X rayed the tibia and diagnosed a possible sprain. DeSaveur failed to note a subtle fracture. Driggs contends that DeSaveur violated the standard of care by failing to identify the fracture and Andrew Howlett violated the standard of care by failing to properly supervise Brandi DeSaveur. Driggs posits that his condition worsened as the result of the failure to promptly diagnose the fracture. On May 27, DeSaveur instructed Driggs to discontinue physical therapy for one week.

On June 7, 2009, Joshua Driggs visited a hospital emergency room due to pain in his right leg. He received a shot and a prescription for pain medication. On June 8, Driggs returned to Dr. Andrew Howlett's office. During the appointment, Howlett X rayed Driggs' tibia and noticed the bone fracture.

On June 11, 2009, Dr. Andrew Howlett performed another surgery and inserted a

4

tibial intramedullary rod into Joshua Driggs' right lower leg. Despite the rod, the cadaver bone failed to fuse with Driggs' live bone.

On December 11, 2009, Dr. Howlett, during another surgery, placed a rod with intermittent screws through the entire tibia. The December 2009 surgery necessarily destroyed Driggs' subtalar joint in his ankle. The surgery also caused equinas, a condition by which Driggs' toes touch the floor but his heel rests two and one-half inches above the floor. Driggs thereafter walked on his right toes.

In July 2010, Dr. Brian Padrta performed an operation to remove two remaining screws and correct the equinas. Nevertheless, as of March 25, 2013, Driggs continued to suffer from severe equinas, numbness in his right foot, and a limp.

## PROCEDURE

On January 17, 2012, Joshua Driggs sued Dr. Andrew Howlett and his employer, Providence Physician Services. Driggs asserted professional negligence and lack of informed consent. The complaint alleged:

> 2.8 On May 27, 2009, JOSHUA DRIGGS returned to DR. HOWLETT'S office with onset of right ankle pain and swelling. X-rays were taken and read as negative for fracture.
> 2.9 On June 7, 2009, JOSHUA DRIGGS went due [sic] to Sacred Heart Medical Center due to extreme pain in his right lower extremity. Images obtained showed an insufficiency fracture.
> . . . .
> 2.12 JOSHUA DRIGGS suffered an insufficiency fracture in his right lower extremity as a result of DR. HOWLETT'S failure to install an intramedullary rod or other stabilization when he removed JOSHUA DRIGGS' medial compression plate on March 9, 2009.

5

. . . .

3.6 The Defendants, ANDREW T.G. HOWLETT, M.D. and JOHN DOE, breached their duties owed to JOSHUA DRIGGS by failing to inform JOSHUA DRIGGS of the relative material risks of removing the stabilization hardware in his allogra[ft] and not replacing it.

3.7 Defendants PROVIDENCE PHYSICIAN SERVICES CO. was independently negligent and negligent by and through the acts and/or omissions of defendant Dr. ANDREW T.G. HOWLETT, M.D. in their capacities as employees, agents, principals, partners, shareholders, corporate officers, directors and/or members of defendants PROVIDENCE PHYSICIAN SERVICES CO.

CP at 10-11, 13-14. The complaint did not specifically identify Physician's Assistant Brandi DeSaveur as a negligent actor. In their answer to the complaint, Dr. Andrew Howlett and Providence Physician Services admitted that Providence employed Dr. Howlett, Howlett acted within the scope of his employment when treating Driggs, and Providence was vicariously liable for any negligence committed by Howlett.

Both parties engaged expert medical witnesses. Joshua Driggs hired two witnesses, Drs. Steven Graboff and Lawrence Menendez. Providence engaged five experts, but only Drs. James Bruckner and Brian Padrta testified at trial.

On May 3 and September 20, 2013, Joshua Driggs deposed Dr. Andrew Howlett. Driggs' counsel addressed, with Howlett, Brandi DeSaveur's failure to diagnose the tibia fracture on May 27, 2009. A portion of the September deposition of Dr. Howlett follows:

Q. And did Brandi DeSaveur have an occasion to interpret an x-ray that was taken, I believe, on May 27th, 2009?
A. If that would be the day that she was in clinic, I—that would—more than likely, that was the day that she got an x-ray.

6

Q. And she did not recognize the start of a fracture in the x-ray, correct?

A. It was a very subtle finding at that time. Correct.

Q. It's something that you recognized immediately when you reviewed the x-ray, correct?

A. I don't remember the exact time when I reviewed the x-ray and what I stated to her at that time.

Q. You were the one, when you reviewed the x-ray, that determined that the fracture had been missed, correct?

MR. KING: Object to the form as to the word "missed," but you may go ahead and respond.

A. I recognized the fracture upon reviewing the x-rays.

Q. (BY MR. SWEETSER) Do you agree that Brandi DeSaveur's failure to timely identify the fracture led to the wrong instructions to the patient to continue to weight bear and participate in physical therapy?

MR. KING: Object to the form. You may respond.

A. Yeah, I think, at that time, if she had recognized the fracture, we probably would have changed our postoperative protocol at that time.

CP at 1270-71.

The parties filed proposed jury instructions and a trial management report weeks before a January 6, 2014 trial. On December 9, 2013, Joshua Driggs proposed a jury instruction that declared Brandi DeSaveur to be an agent of Providence and any act or omission of DeSaveur was an act or omission of Providence. On December 12, 2013, Driggs filed a joint trial management report, which read in part: "[*The Plaintiff also contents [sic] that Dr. Howlett and coemployees failed to follow the standard of care in their follow up treatment under the circumstances.* (The Defendant objects to this statement.)]." CP at 112 (alterations in original). The trial management report did not name Brandi DeSaveur as a coemployee who breached the standard of care.

7

Joshua Driggs' feature witness, Dr. Lawrence Menendez, has served on the University of Southern California Keck School of Medicine staff since 1985. He specializes in the care of bone tumors. He teaches orthopedic oncology to medical students. He has been board certified since 1987. Menendez is a member of the American Academy of Orthopedic Surgeons, Musculoskeletal Tumor Society, and International Society on Limb Salvage and sometimes lectures at the respective organizations' meetings.

Dr. Lawrence Menendez could not attend trial to testify. On December 12, 2013, Joshua Driggs conducted a video recorded perpetuation deposition of Menendez to play to the jury. Near the beginning of Dr. Lawrence Menendez's deposition, Joshua Driggs' counsel remarked and asked:

> Q And, Doctor, again, I want you to base your opinions on reasonable degree of medical certainty based upon what's more likely than not likely as I ask you questions about your opinions in this regard.
> Did you have a chance to look at X-rays after the surgery in March of 2009?
> A Yes.

CP at 1347. Note that Dr. Menendez did not respond to counsel's direction to base his opinions on reasonable medical certainty.

During the deposition, Dr. Lawrence Menendez spoke about failings of allografts from weakness and incapacity to incorporate into the host bone. He promoted the need to affix an allograft with plates and screws to promote strength in the allograft. He

8

commented on holes or weak areas in the allograft called stress risers, which fracture
without protection from hardware. Dr. Menendez testified that

> when you take the hardware out, for whatever reason it might be,
> you generally want to minimize the risk of fracture ... you want to put
> something back in . . . you want to protect it so that you minimize the risk
> of fracture.

CP at 1343.

During his deposition, Dr. Lawrence Menendez testified that in 2009 the national
standard of care for removing fixation from an allograft required replacement of the
fixation. Joshua Driggs then questioned Dr. Menendez about whether a fracture will
result from the lack of fixation:

> A Yes.
> Q Okay.
> Is there a national standard of care with regards to removing a plate
> or a fixation of this nature, 2009, as to what you should do with regards to
> supporting the allograft—this allo-—type of allograft?
>
> . . . .
> MR. KING: Objection. . . .
> BY MR. CASEY:
> Q Go ahead and answer, Doctor, as to the national standard of care.
> Is there a national standard of care?
> A Well, the majority of people who use allografts on a routine bases
> are generally very concerned about protecting the allograft because of the
> problems that result when you don't. So in my experience and based on,
> again, presentations, reading and so forth, that it would be very unusual to
> not put fixation back into the allograft. That is, to leave it bare is risky.
>
> . . . .
> MR. KING: Move to strike as being nonresponsive. . . .
> BY MR. CASEY:
> Q Okay. I'll reask it, Doctor.

No. 32381-1-III
*Driggs v. Howlett, M.D.*

Basically, Doctor, is there, nationally, a standard of care with regards to replacing or as to what you do if you're going to be removing fixation from a patient, 2009, similar to this type of hardware?

MR. KING: Same objection.

THE WITNESS: So the standard of care is to put fixation in.

BY MR. CASEY:

Q Is that a national standard?

MR. KING: Same objection. . . .

BY MR. CASEY:

Go ahead, Doctor.

A Yes.

Q What was that?

A Yes.

Q And when you say "put fixation in," what do you mean?

A I mean, to put in, in the case of long, structural allografts, either a plate and screws or a rod, metal rod, that's also affixed with screws.

. . . .

Q And, Doctor, again, I want you to base your opinions on reasonable degree of medical certainty based upon what's more likely than not likely as I ask you questions about your opinions in this regard.

Did you have a chance to look at X-rays after the surgery in March of 2009?

A Yes.

. . . .

Q Doctor, do you have an opinion, based upon what's more probable than not—more likely than not as to whether or not had there been a rod placed, it would not have fractured when it did?

MR. KING: Same objection.

Go ahead, Doctor.

. . . .

THE WITNESS: So if you put internal fixation in in a form of a rod, there's a likelihood that the allograft will fracture.

. . . .

So it's less likely that you'll get a fracture if you put fixation in to support the allograft. If you don't put fixation in, it's more likely that you'll have a fracture for the reasons I discussed earlier.

CP at 1343-47, 1350-51.

10

No. 32381-1-III
*Driggs v. Howlett, M.D.*

Providence Physician Services also questioned Dr. Menendez during the

perpetuation deposition:

> Q  No.  My question is: The opinions you've expressed here today in response to my questions and Mr. Casey's questions are simply your personal opinions?
> . . . .
> THE WITNESS:  Well, I mean, technically, I'm offering my opinion . . . based on my knowledge and expertise and education and experience, but I haven't given you a specific article or pieces of literature, anything of that nature. So technically, it's my opinion, yes.

CP at 1411.

On December 20, 2013, Providence Physician Services moved to exclude

evidence of the circumstances leading to Providence's termination of Brandi DeSaveur.

In response, Joshua Driggs commented that evidence established that DeSaveur should

have, but failed to, discern fractures present on the May 27, 2009 X ray, and, as a result,

Driggs' fractures worsened and complicated his treatment.

On December 31, 2013, Providence Physician Services filed a supplemental

motion in limine to preclude testimony by Dr. Lawrence Menendez regarding the

standard of care, medical causation, and medical risk for informed consent.  Providence

underscored that Dr. Menendez is from California and he testified, during his deposition,

to a "national standard of care" rather than a Washington standard of care.  Joshua Driggs

responded that an out-of-state expert may testify to the national standard of care as long

as other evidence shows the standard of care in Washington to be a national standard.

11

Driggs submitted a declaration by Dr. Menendez stating that he conferred with experts within Washington and determined that the Washington standard of care was equivalent to the national standard. In response, Providence argued that submission of a supplemental declaration amounted to an ambush, did not allow for cross-examination, was inadmissible, and should not be considered by the trial court when ruling on its motion. The trial court agreed with Providence's characterization of the declaration as an "ambush" and refused to consider it. After hearing the parties' arguments on January 2, 2014, the court reserved ruling on the motion.

On January 7, 2014, Joshua Driggs began presenting his case to the jury. That day, Driggs submitted to the court an affidavit from Dr. Lawrence Menendez averring that he contacted medical colleagues in the state of Washington to confirm that the practices in Washington echoed the national standards of the American Orthopedic Association, that the standard of care applicable in this case is a national standard, and that he is aware of the standard of care in Washington.

On January 9, 2014, orthopedic surgeon Steven Graboff testified at trial as an expert for Joshua Driggs. When Dr. Graboff first sought entry into medical school, no United States school admitted him. He, therefore, began medical school in Guadalajara, Mexico. After four years and three months of schooling in Mexico, Graboff transferred to the University of California at Irvine School of Medicine, where he received a medical degree in 1980. Graboff is also board certified, although, according to Graboff, he has

12

encountered difficulty on occasion in retaining certification. Dr. Graboff is not a specialist in tumors, but has experience with limb salvage through allografts. The American Academy of Orthopedic Surgeons suspended Graboff for two years for testimony he gave in a medical malpractice suit.

Dr. Steven Graboff's trial testimony included:

> Q Okay. Do you have—do you know whether the national standard of care and the Washington state standard of care is any different?
> A I do know that the standard of care here is the same as the national standard of care.
> . . . .
> Q What's your understanding of his [James Bruckner's] testimony?
> A My review of Dr. Bruckner's testimony is that he stated in his deposition that the Washington standard is a national standard. It's no different than anywhere else.
> Q You verified that with other orthopedic doctors in the state of Washington?
> A I did.
> Q Okay. Are you familiar then with the national standard and the standard of care in the state of Washington?
> A I am.

3 Verbatim Report of Proceedings (VRP) (Jan. 9, 2014) at 376-77. Dr. Graboff later testified that a physician violates the standard of care if he does not replace fixation for an allograft with other fixation.

Concerning the care provided by Physician Assistant Brandi DeSaveur, Dr. Steven Graboff testified:

> Q Okay. And, Doctor, I want you to assume there's been testimony yesterday that a Ms. Desaveur was the one that interpreted the May 27th x-ray, and you've had a chance to review that?

13

A Yes.

Q Do you have an opinion as to whether or not there was, from an orthopedic standpoint, a violation that the standard of care as to the interpretation of that?

MR. KING: Your Honor, may we approach?

THE COURT: Yes.

. . . .

MR. KING: There's never been an allegation that Ms. DeSaveur did anything wrong in this case, and there's never been a disclosure in any pleading that there was a failure to supervise in this case. It came up on the fly in his deposition in mid November of this year.

So we object on that basis. It's not a pleaded theory of recovery.

THE COURT: Well, my understanding is this came out of Mr. Sweetser's opening statements, also.

MR. KING: That doesn't—

THE COURT: Yeah, but you didn't object. I assumed that was part of the theory of the case, so.

MR. KING: Opening statement isn't evidence, and opening statement isn't a pleading. So I want to preserve my record, and I think that he's going into an area that it is impermissible for those reasons.

THE COURT: I'll note your objection for the record.

(BENCH CONFERENCE CONCLUDED.)

THE COURT: You may proceed.

Q (By Mr. Casey) Did you follow my question? Can you still answer it, Doctor?

A I can't remember what it was.

Q Do you have an opinion as to whether or not the x-ray of May 27th from an orthopedic standpoint as to whether or not there was a violation of the standard of care in interpreting that x-ray?

A I do.

Q What is your opinion?

A My opinion is that the May 27, 2009 x-ray was negligently interpreted. The fracture was misdiagnosed, and the orthopedic surgeon himself never actually saw that film at that time, which was a breach in the standard of care.

. . . .

Q And what information did you see that may lead someone to a sprained ankle in that diagnosis?

A Nothing.

14

Q Okay. You have an opinion as to whether that diagnosis violated the standard of care?

MR. KING: Your Honor, again, same objection. Now we've changed from orthopedics to PA, which is a distinctly different issue.

THE COURT: I'll sustain it at that point.

Q (By Mr. Casey) Okay. Well, from the standpoint of should that have been delegated to a PA by an orthopedic surgeon as far as the management of Mr. Driggs considering his surgery?

A No.

Q And if an orthopedic surgeon had considered it, what would the standard of care require?

A If an orthopedic surgeon had considered the symptoms, the presentation and the x-ray, the standard of care would have required the diagnosis to be that of a fracture through the screw hole post-operatively.

3 VRP (Jan. 9, 2014) at 399-402, 405.

On January 13, 2014, the trial court entertained additional argument on Providence Physician Services' motion to exclude portions of Dr. Lawrence Menendez's testimony. Providence contended that Dr. Menendez must know the Washington standard of care and may not rely on other experts to establish the foundation for his testimony. Also, Providence argued that all of Dr. Menendez's opinions were personal opinions and did not meet the testimonial requirement that a medical expert's testimony be based on a degree of reasonable medical probability. Providence also asked to exclude Dr. Menendez's testimony on whether removing the plate without installing a rod was a material risk and required Joshua Driggs' informed consent. Providence argued that Dr. Menendez never provided any testimony as to the scientific nature of the risk and the likelihood of its occurrence.

15

The trial court granted Providence's motion to exclude Dr. Menendez's testimony about the standard of care, medical causation, and risk for informed consent. The court observed that no law supported Joshua Driggs' reliance on another physician's testimony to lay the foundation for Dr. Lawrence Menendez's opinion that the Washington and national standards of care correspond. In its ruling, the trial court noted that Lawrence Menendez never agreed, in response to counsel's direction, to base his opinion on reasonable medical probability. The trial court also noted that Dr. Menendez, in response to questioning by defense counsel, commented that his opinions are personal opinions.

Providence Physician Services called to testify Orthopedic Surgeon James Bruckner, of Bellevue, Washington. Despite Dr. Steven Graboff earlier claiming to the contrary, Dr. Bruckner, at trial, denied testifying in his deposition that the national and Washington standards of care corresponded. Bruckner testified at trial that he had no knowledge of whether the state of Washington standard equated with the national standard. Dr. Bruckner testified that, under the standard applied in Washington, if not nationally, an orthopedist exercises discretion as to whether or not fixation is needed for the allograft. In other words, fixation is not always demanded. Dr. Bruckner conceded, nonetheless, that he has never removed fixation for an allograft without substituting other fixation.

On January 15, 2014, Joshua Driggs submitted additional and alternative jury instructions and a proposed jury verdict form that allowed the jury to find Providence

16

Physician Services liable if the jury found negligence by Dr. Andrew Howlett or Physician Assistant Brandi DeSaveur. On January 17, 2014, Driggs requested the trial court to reverse its decision to exclude Dr. Menendez's testimony. Driggs contemporaneously submitted supplemental declarations of Dr. Menendez stating the standard of care in Washington is equivalent to the national standard of care and that he based his testimony on a more probable than not basis to a reasonable degree of medical certainty. The trial court refused to reverse its ruling.

On January 23, 2014, the trial court hosted exceptions and objections to the proposed jury instructions. Providence Physician Services objected to Joshua Driggs' proposed jury instruction thirteen, which allowed the jury to find Providence liable if it found Brandi DeSaveur, as an agent of Providence, negligent. In turn, Driggs argued:

> You don't have to name a specific agent when you sue a corporation, and our theory of the case is the corporation is negligent. Dr. Howlett is negligent. PAC Brandy [sic] Desaveur is negligent, and Janette Worley are negligent, and they're agents of the corporation, and we've proven that they're agents and acting within the scope of their employment.

10 VRP (Jan. 23, 2014) at 1597.

The trial court rejected Joshua Driggs' instruction thirteen and approved a jury verdict form that identified only Dr. Andrew Howlett as an agent of Providence. During argument on the instruction, the trial court stated:

> So you can argue Brandy [sic] DeSaveur and Janette Worley, but to put them in the instruction, this is the law. The law is that you are accusing Dr. Howlett of not supervising. Therefore, Brandy DeSaveur and Janette Worley

17

should [sic] be on the instruction, but you can argue it because that's your theory of the ace [sic].

. . . .

So I am going to let him argue that depending on how the argument comes, but the theory of the case is that Dr. Howlett was negligent by not reviewing it. Brandy [sic] DeSaveur didn't bring it to his attention according to Dr. Howlett's own testimony, and that in retrospect, he sees she missed.

Depending on how you tie it in, Ms. DeSaveur is not being sued herself. She isn't listed in the Complaint, but the original was that she failed to bring it to his attention, and he should have supervised it and checked it. So it ties Dr. Howlett and Providence together.

For the record, on the instructions, I will take off Brandy [sic] DeSaveur and Janette Worley and just leave Dr. Howlett.

10 VRP (Jan. 23, 2014) at 1598-99, 1604.

During closing arguments, Providence Physician Services focused on the dearth of reliable expert testimony supporting Joshua Driggs' case. Providence attacked the credibility of Dr. Steven Graboff and emphasized the lack of opinions from Dr. Lawrence Menendez on the standard of care, causation, and risks:

So Mr. Casey [Joshua Driggs' counsel] wanted to talk to you about circumstantial evidence, and that's fine. That's totally appropriate. Does anybody remember Dr. Graboff? Mr. Casey must not because he spent an hour talking to you of their only witness on the standard of care in this case and didn't mention his name, didn't mention his name. You spent a day of your life listening to this expert on the standard of care, and apparently, Mr. Casey is so concerned that someone may discuss what Dr. Graboff says that he hopes it doesn't come to your attention and nobody will talk about him.

This entire case on the standard of care theory rests on the very slender and very fragile and very unstable threat of the testimony of one physician, Dr. Graboff. I just want to talk for a minute about the plaintiff's case.

The plaintiffs claim here there was a violation of the standard of care by Dr. Howlett in connection with this surgery. The reason that you're going to be asked to adjudicate that claim of the two claims that have been

18

filed here is because they brought in an expert, Dr. Graboff, who said that it's a violation of the standard of care not to put fixation in after the hardware was removed from the allograft in this case. That was his testimony, okay?

The other expert they brought in who was mentioned twice in Mr. Casey's closing argument and only after 40 minutes of talking about what he says is circumstantial evidence, is Dr. Menendez. Let's just imagine that the only case you had to adjudicate here was the standard of care case and the only witnesses you heard from were Dr. Graboff and Dr. Menendez because those are the two experts that the plaintiff called to prove that my client violated the standard of care. Put yourself in that position.

What do we know about how to evaluate that testimony? Well, the Judge just told you in the instructions what you can do to evaluate credibility, to evaluate bias, to evaluate whether or not they have adequate training and credentials. Let's stack up plaintiff's two experts against each other.

Dr. Graboff hasn't done surgery since 2005, was kicked out of the most prestigious organization for orthopedic surgeons in the country because he violated their ethical codes having to do with testimony.

He makes in excess of $400,000 a year traveling around the country testifying against other physicians in medical malpractice litigation. He has not had hospital privileges since 2005. He has testified in more than 160 cases against healthcare providers on behalf of plaintiffs. He's given more than 500 depositions in medical-related claims and cases all on the side of or substantially on the side of the plaintiff.

He's a hired gun. Is he well trained? We know his struggles to get into medical school to begin with. He applied to 16 schools throughout the country, was rejected by every one of them. He went to medical school in Mexico for four years, and at the end of each year, applied to a medical school in the United States and was turned down. Finally was admitted to UC Irvine, finished his medical school, got into a decent residency program at UCLA, got his credentials as an orthopedic surgeon in 1984 and quit doing surgery in 2005. Then he tried to recertify as an orthopedic surgeon, pass his boards again and he flunked twice.

He is not Fellowship trained. He's never authored a single article in the peer-reviewed medical literature. He is for hire. That's what the evidence shows in this case. That's their expert. That's Dr. Graboff.

Who is their other expert? Dr. Menendez. Well-qualified individual, Fellowship trained orthopedic oncologist, teaches at an

19

academic center. Remember the Musculoskeletal Tumor Society, the organization that kicked Dr. Dr. [sic] Graboff off?

He testified by videotape. Did he say that Dr. Howlett violated the standard of care any way, shape or form in this case? No. Did he say that fixation hardware if put in place in March of '09 would have prevented this fracture? No. Did he provide any information to you that there was a violation of the standard of care in the postoperative management of this patient after the March 6, 2009 surgery by Dr. Howlett? No.

Did he say there was a violation of the standard of care having to do with the interpretation of the May 27, 2009 x-ray? No.

Did he say that but for the failure to put in fixation hardware in this case, Mr. Driggs with his ankle fusion and his previously failed allograft would have no difficulty or problem with his lower extremity? No.

That's the plaintiff's case on the standard of care. That's the quality of the evidence that they put on, and the quality of the evidence that they put on as it relates to their standard of care claim rests entirely on an expert who will, I think you could find, go anywhere at any time and say anything to support a claim against a physician and has done it and apparently has no compunction about continuing to do it. That's their case on standard of care in their own case.

10 VRP (Jan. 23, 2014) at 1687-91.

The jury entered a verdict in favor of Providence Physician Services.

## LAW AND ANALYSIS

On appeal, Joshua Driggs contends that the trial court abused its discretion by excluding expert testimony of Dr. Lawrence Menendez. He also maintains that the trial court erred in refusing its proposed jury instruction naming Brandi DeSaveur as an employee accused of negligence. Driggs claims either error by itself constituted harm that requires remand for a new trial. We focus on the exclusion of Lawrence Menendez's testimony and opinions.

20

Lawrence Menendez's Testimony

The trial court excluded Dr. Lawrence Menendez's opinions regarding the standard of care for fixation of allografts, the absence of fixation causing a fracture and other complications in Joshua Driggs's right leg, and the risks attended to the absence of fixation. The trial court excluded testimony on the standard of care because Dr. Menendez did not testify to a Washington standard of care. The court barred testimony on causation because Menendez never stated that he based his opinion on reasonable medical probability. The trial court rejected testimony on the risk for purposes of informed consent because Menendez did not reference percentages of the risk. In its ruling, the trial court also mentioned that Menendez agreed with defense counsel that his opinions were personal opinions. An expert's testimony as to his personal opinions could be a basis to reject all opinions stated, although the record does not show which of the opinions the trial court excluded on this basis.

In the published portion of this opinion, we review whether Dr. Lawrence Menendez could testify to a national standard of care if another physician testifies that the Washington standard equates to the national standard. We also review whether the exclusion of Dr. Menendez's many opinions was harmless to Joshua Driggs. In the unpublished portion of the opinion, we examine whether Dr. Menendez testified on the basis of reasonable medical probability, whether Menendez's opinions are inadmissible

21

as personal opinions, and whether Lawrence Menendez could testify to Driggs' informed

consent cause of action.

We review the decision to exclude an expert witness's testimony for abuse of

discretion. *Winkler v. Giddings*, 146 Wn. App. 387, 392, 190 P.3d 117 (2008).

Discretion is abused if it is exercised on untenable grounds or for untenable reasons.

*Morin v. Burris*, 160 Wn.2d 745, 753, 161 P.3d 956 (2007). Important for this appeal is

the rule that a decision is based on untenable grounds or made for untenable reasons if it

was reached by applying the wrong legal standard. *Mitchell v. Wash. State Inst. of Pub.

Policy*, 153 Wn. App. 803, 821-22, 225 P.3d 280 (2009). A trial court that

misunderstands or misapplies the law bases its decision on untenable grounds. *Little v.

King*, 160 Wn.2d 696, 703, 161 P.3d 345 (2007). In reviewing a ruling for abuse of

discretion, this court will often separate questions of fact from the conclusions of law that

they support and refuse to defer to the trial court on conclusions of law. *Bartlett v.

Betlach*, 136 Wn. App. 8, 18, 146 P.3d 1235 (2006).

*State Standard of Care*

As a preliminary matter, the parties dispute whether the trial court correctly

disallowed a supplemental declaration from Dr. Lawrence Menendez. Joshua Driggs

filed the declaration after the perpetuation deposition of Dr. Menendez and in response to

Providence Physician Services' motion to strike testimony of Menendez. In the

declaration, Dr. Menendez disclosed that he conferred with experts within Washington

State and determined that the Washington standard of care was equivalent to the national standard concerning the need for fixation of an allograft. We decline to resolve whether the trial court abused its discretion when refusing to consider this additional testimony of Menendez. Even without the declaration testimony, we rule that Dr. Menendez's opinion on the standard of care should have been heard by the jury. Principles of judicial restraint dictate that if resolution of another issue effectively disposes of a case, we should resolve the case on that basis without reaching the first issue presented. *Wash. State Farm Bureau Fed'n v. Gregoire*, 162 Wn.2d 284, 307, 174 P.3d 1142 (2007); *Hayden v. Mut. of Enumclaw Ins. Co.*, 141 Wn.2d 55, 68, 1 P.3d 1167 (2000).

In a medical malpractice claim, a plaintiff must show that the health care provider violated the relevant standard of care. A plaintiff must prove the relevant standard of care through the presentation of expert testimony, unless a limited exception applies. *Volk v. Demeerleer*, 184 Wn. App. 389, 430-31, 337 P.3d 372 (2014), *review granted,* 183 Wn.2d 1007 (2015). In turn, the trial judge must make a preliminary finding of fact under ER 104(a) as to whether an expert is qualified to express an opinion on the standard of care in Washington. *Winkler v. Giddings*, 146 Wn. App. at 392 (2008).

By Washington statute, the standard of care is the degree of "care, skill, and learning expected of a reasonably prudent health care provider at that time in the profession or class to which he belongs, *in the state of Washington*, acting in the same or similar circumstances." RCW 7.70.040 (emphasis added). One might question if the

23

standard of care in Washington ever differs from the standard of care throughout the nation. Law changes from state to state, but medical care holds constant throughout America, at least outside rural areas. Increasingly, medical experts testify that Washington follows a national standard of care. We remain bound, however, by our legislature's declaration that the trier of fact must find and apply a state standard of care.

Joshua Driggs suggests that a trier of fact may assume that the national standard of care and the state standard of care coalesce unless one witness testifies to a differing standard. A lax reading of *Winkler v. Giddings*, 146 Wn. App. 387 (2008) and *Pon Kwock Eng v. Klein*, 127 Wn. App. 171, 110 P.3d 844 (2005) could support such a rule. In each decision, this court underlined the absence of testimony from the defending physician that Washington retained a variant standard of care. Nevertheless, neither case expressly adopted such a rule. We need not decide whether to adopt such a rule because we may rest our decision on other grounds.

A physician licensed in another state may provide admissible testimony that a national standard of care exists in this state and that the defendant physician violated that standard. *Elber v. Larson*, 142 Wn. App. 243, 248, 173 P.3d 990 (2007); *Pon Kwock Eng v. Klein*, 127 Wn. App. at 179. In his deposition, Dr. Lawrence Menendez testified that Dr. Andrew Howlett violated the national standard of care of an orthopedist oncologist by failing to affix the allograft during the March 6, 2009 surgery. Menendez did not affirm that the Washington standard of care followed the national standard of care.

24

Nevertheless, Dr. Steven Graboff at trial averred that the national and Washington standards of care are equivalent. We rule that Dr. Graboff's testimony lays a sufficient predicate for Dr. Menendez's opinion.

Providence Physician Services contends that the only type of expert competent to testify as to the standard of care required of a practitioner in the state of Washington is an expert who knows the practice and standard of care in Washington. Providence cites *McKee v. American Home Products Corporation*, 113 Wn.2d 701, 706-07, 782 P.2d 1045 (1989) for this proposition. *McKee* included a claim of pharmacist malpractice. The only evidence provided by the plaintiff concerning the standard of care of a pharmacist practicing in Washington was an affidavit of an Arizona physician. The Supreme Court disregarded the opinion of the physician because he was not a pharmacist. The Supreme Court also rejected the opinion because the physician did not reference the standard of care of a pharmacist in this state. *McKee v. American Home Products Corporation* does not address our issue: whether one physician may testify solely to a national standard of care when another physician testifies that the Washington standard echoes the national standard.

Providence Physician Services argues that allowing a witness's familiarity with the applicable standard of care to be established through other witnesses would subvert the process of expert witness qualification. In other words, Providence advocates a rule that would require that an expert in a medical malpractice case know the standard of care

25

in Washington State before the trial court accepts the witness as an expert. In so arguing, Providence may confusingly conflate the qualifications of an expert witness to testify with the opinions to which the witness may testify. No rule requires that an expert possess, within his personal knowledge, all information necessary to qualify him as an expert witness. No rule precludes a party from relying on one expert witness for a portion of needed evidence and another expert witness for another segment of required testimony. RCW 7.70.040 does not preclude a party from relying on more than one medical expert to establish that the defendant health care provider violated the standard of care in Washington. Thus, based on Washington case law discussed below, we hold that a qualified medical expert may testify to a national standard of care alone if another qualified medical expert at the same trial testifies that the Washington standard parallels the national standard.

One expert may rely on the opinions of another expert when formulating opinions. *State v. Russell*, 125 Wn.2d 24, 69, 882 P.2d 747 (1994); *Volk v. Demeerleer*, 184 Wn. App. at 430-31 (2014); *Deep Water Brewing, LLC v. Fairway Res. Ltd.*, 152 Wn. App. 229, 271, 215 P.3d 990 (2009). This rule may assume that the testifying expert has contacted another expert and gained information from the second expert before testifying. Dr. Menendez did not learn, before his perpetuation deposition, from another physician that the national standard of care and state standard coincided. We see no difference however, for practical purposes, if the litigant, rather than the expert witness, presents

26

such information at trial through the second expert. In other words, we conclude the plaintiff may call to the stand the second expert to notify the jury that the state standard echoes the national standard particularly when the first expert could have called the second expert on the phone to learn of the state standard and repeat the second expert's comments to the jury. If anything, the evidence for the plaintiff strengthens if the second witness provides the foundation during trial testimony, since the jury hears the additional information directly from the second expert rather than through the first witness's hearsay statement of what another expert told him. The second expert's opinion that the Washington standard equates to the United States standard also then become subject to cross-examination by the defense. Joshua Driggs' jury heard first hand from Dr. Steven Graboff that the national standard of care and state standard of care conflate. Driggs accomplished directly what he could have achieved indirectly through an earlier phone conversation between Dr. Lawrence Menendez and Dr. Steven Graboff. Thus, Lawrence Menendez's testimony as to the national standard was admissible.

Three decisions, *Hill v. Sacred Heart Medical Center*, 143 Wn. App. 438, 177 P.3d 1152 (2008), *Winkler v. Giddings*, 146 Wn. App. 387 (2008), and *Elber v. Larson*, 142 Wn. App. 243 (2007) discuss to varying extents the issue presented in this appeal. Providence Physician Services relies on *Winkler v. Giddings*. In *Winkler*, plaintiff's expert testified to an "educated assumption that the standard of care was the same across the country." 146 Wn. App. at 392. Plaintiff presented no other evidence that the

27

Washington standard of care followed the national standard. Dr. Neil Giddings presented testimony that the relevant standard of care differed depending on the area of the country.

*Winkler* is easily distinguishable because Joshua Driggs presented the additional testimony from Steven Graboff. Dr. Andrew Howlett presented no testimony of a varying standard of care from one region to another.

In *Elber v. Larson*, the physician in a medical malpractice suit moved for summary judgment. The physician contended that plaintiff's witness, Dr. Daniel Meub, was not qualified as an expert witness because Meub lacked background, training or experience in Washington. The trial court granted summary judgment. This court reversed and held that a medical expert is qualified to testify to the Washington standard of care if he offers uncontradicted testimony that he is familiar with the standard of care and that the standard is a national standard.

A compelling decision is *Hill v. Sacred Heart Medical Center*. Plaintiff John Hill presented testimony from two physicians. One physician testified that the national standard of care controlled the conduct of the defendants, but did not expressly state that he knew the Washington standard of care to coincide with the national standard. A second physician testified that she knew the Washington standard to parallel the national standard. This court relied on both physicians' testimony when reversing a summary judgment dismissal of the medical malpractice suit.

We recognize that Joshua Driggs presented at trial the deposition of Dr. Lawrence

28

Menendez before presenting Dr. Steven Graboff to testify. Nevertheless, an evidence rule allows testimony to be presented at trial when that testimony is admissible only on the assumption that later testimony is presented. ER 104(b).

We recognize the need to defer to the trial court in evidentiary rulings. Nevertheless, the trial court's exclusion of Dr. Lawrence Menendez's testimony resulted from a misapplication of the law. Thus, we rule the trial court abused its discretion.

Providence Physician Services distinguishes *Elber v. Larson* and *Hill v. Sacred Heart Medical Center* on the ground that the trial court disregarded expert opinions when addressing a summary judgment motion and this court reviews evidentiary rulings de novo when examining a summary judgment ruling. We recognize this distinction, but we may still reverse a trial court evidentiary ruling at trial based on a misperception of the law.

*Harmless Error*

Providence Physician Services contends that, assuming the trial court's exclusion of Dr. Lawrence Menendez's opinions is error, the error was harmless. Providence underscores the fact that Dr. Steven Graboff testified to each opinion of Lawrence Menendez that the trial court excluded. Therefore, Providence argues the excluded testimony of Menendez would have been cumulative.

When a trial court makes an erroneous evidentiary ruling, the question on appeal becomes whether the error was prejudicial, for error without prejudice is not grounds for

29

reversal. *Brown v. Spokane County Fire Prot. Dist. No. 1*, 100 Wn.2d 188, 196, 668 P.2d 571 (1983); *Mut. of Enumclaw Ins. Co. v. Gregg Roofing, Inc.*, 178 Wn. App. 702, 728-29, 315 P.3d 1143 (2013). An error will be considered harmless unless it affects the outcome of the case. *State v. Jackson*, 102 Wn.2d 689, 695, 689 P.2d 76 (1984); *Brown*, 100 Wn.2d at 196. A harmless error is an error which is trivial, or formal, or merely academic, and was not prejudicial to the substantial rights of the party assigning it, and in no way affected the final outcome of the case. *Anfinson v. FedEx Ground Package Sys., Inc.*, 159 Wn. App. 35, 44, 244 P.3d 32 (2010), *aff'd*, 174 Wn.2d 851, 281 P.3d 289 (2012).

Error will be considered prejudicial if it presumptively affects the outcome of the trial. *James S. Black & Co. v. P&R Co.*, 12 Wn. App. 533, 537, 530 P.2d 722 (1975). When the reviewing court is unable to know what value the jury placed on the improperly admitted evidence, a new trial is necessary. *Thomas v. French*, 99 Wn.2d 95, 105, 659 P.2d 1097 (1983); *Smith v. Ernst Hardware Co.*, 61 Wn.2d 75, 80, 377 P.2d 258 (1962); *State v. Murphy*, 7 Wn. App. 505, 508-10, 500 P.2d 1276 (1972). The rule should be the same when the appeals court may not judge what value a jury may place on improperly excluded evidence.

We agree with Providence Physician Services that normally exclusion of cumulative evidence is harmless. Improper admission of evidence constitutes harmless error if the evidence is cumulative. *Hoskins v. Reich*, 142 Wn. App. 557, 570, 174 P.3d

30

1250 (2008). A factor to consider when determining harmless error is whether excluded evidence involved cumulative evidence. *State v. Johnson*, 124 Wn.2d 57, 76, 873 P.2d 514 (1994); *Kimball v. Otis Elevator Co.*, 89 Wn. App. 169, 178, 947 P.2d 1275 (1997). Probably all American jurisdictions follow this rule. *People v. Fletcher*, 328 Ill. App. 3d 1062, 1071-72, 768 N.E.2d 72, 263 Ill. Dec. 312 (2002); *Gonzalez v. Stevenson*, 791 S.W.2d 250, 253 (Tex. App. 1990).

We decline to follow the cumulative evidence rule in this appeal for three reasons. First, the excluded opinions of Dr. Lawrence Menendez probed the central issues in dispute in this case. Menendez's opinions included whether Dr. Andrew Howlett's treatment fell below the standard of care, whether that negligent treatment proximately caused Driggs' harm, and whether the risk of harm from the surgery was so material that a reasonable patient would have wanted disclosure and would have chosen different treatment.

Second, the jury garnered the misimpression that Dr. Lawrence Menendez lacked opinions on these key issues. During closing argument, Providence Physician Services highlighted that Lawrence Menendez provided no opinions on these key issues. Of course, Providence did not disclose to the jury that Menendez held opinions but the opinions were excluded from their hearing.

Third, in addition to noting the absence of opinions from Dr. Menendez, Providence excoriated the credentials and credibility of Dr. Steven Graboff, the other

physician who provided the same favorable testimony as Lawrence Menendez. Providence's own words during closing argument concerning Graboff's character as an unqualified, disgraced, hired gun, whose opinions cannot be believed, illustrate the harm of the exclusion of Lawrence Menendez's opinions. None of the reported decisions, wherein the court holds harmless exclusionary error with regard to cumulative evidence, concern these three factors.

One foreign decision of limited relevance is *Harper v. Roberts*, 173 Ohio App. 3d 560, 2007-Ohio-5726, 879 N.E.2d 264. Home owners sued roof contractors for breach of contract in connection with the construction of a new roof that leaked during rainfall. The jury ruled in favor of the contractors and the Court of Appeals reversed and remanded for a new trial. The reviewing court held that the trial court committed error during a "biased" questioning of the owners and their expert witness. More importantly, the error was prejudicial because the case depended on the credibility of the witnesses.

In this appeal, with the credibility of Steven Graboff impugned, Dr. Lawrence Menendez's testimony grew critical. The error in excluding Dr. Menendez's testimony was not harmless. On this basis, we reverse the jury's verdict and remand for a new trial consistent with this opinion.

A majority of the panel having determined that only the forgoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder having

no precedential value shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

*Reasonable Medical Probability*

Joshua Driggs next challenges the trial court's decision to exclude Dr. Lawrence Menendez's testimony on medical causation. Dr. Menendez opined that removing a plate from a grafted cadaver bone without replacing the plate with another plate or rod likely leads to a fracture. Thus, according to Menendez, the failure by Dr. Andrew Howlett to insert a rod caused Joshua Driggs' tibia to fracture and led to other complications. Providence Physician Services argues that Dr. Menendez's testimony is incompetent because he failed to affirmatively testify that his testimony was based on a reasonable degree of medical probability. Driggs argues that Menendez expressed an opinion on causation based on reasonable medical probability, even if Menendez did not expressly acknowledge in his deposition that his testimony would do so. We concur with Joshua Driggs.

We repeat the relevant passage in Dr. Lawrence Menendez's perpetuation deposition:

> Q And, Doctor, again, I want you to base your opinions on reasonable degree of medical certainty based upon what's more likely than not likely as I ask you questions about your opinions in this regard.
> Did you have a chance to look at X-rays after the surgery in March of 2009?
> A Yes.
> . . . .

33

Q Doctor, do you have an opinion, based upon what's more probable than not—more likely than not as to whether or not had there been a rod placed, it would not have fractured when it did?

MR. KING: Same objection.

Go ahead, Doctor.

THE WITNESS: So if you put internal fixation in in a form of a rod, there's a likelihood that the allograft will fracture.

. . . .

So it's less likely that you'll get a fracture if you put fixation in to support the allograft. If you don't put fixation in, it's more likely that you'll have a fracture for the reasons I discussed earlier.

CP at 1347, 1350-51.

Note that Dr. Menendez did not respond, let alone affirmatively respond, to Joshua Driggs' counsel's instruction to base his opinions on a reasonable degree of medical certainty. Nevertheless, as to Menendez's opinion on causation, Menendez responded to a question as to whether he held an opinion based on what's more probable than not. Litigation counsel would be wise to insist that a medical expert agree to expressly affirm that his opinions will be based on reasonable medical probability, before counsel asks questions. In the alternative, litigation counsel would be wise to phrase ever critical questions in terms of reasonable medical probability based on the expert's experience and training. Nevertheless, we agree with Joshua Driggs that, reviewing the deposition as a whole, Menendez formulated his opinion on causation based on reasonable medical probability.

Generally, expert medical testimony on the issue of proximate cause is required in medical malpractice cases. *McLaughlin v. Cooke*, 112 Wn.2d 829, 837-38, 774 P.2d

34

1171 (1989); *Hill v. Sacred Heart Med. Ctr.*, 143 Wn. App. at 448 (2008). Evidence establishing proximate cause in medical malpractice cases must rise above speculation, conjecture, or mere possibility. *Reese v. Stroh*, 128 Wn.2d 300, 309, 907 P.2d 282 (1995). Instead, medical expert testimony must be based on a "reasonable degree of medical certainty." *Reese v. Stroh*, 128 Wn.2d at 305-06. Despite the use of the term "certainty" in some opinions, "probability" is sufficient. Reasonable medical probability and reasonable medical certainty are used interchangeably. *Anderson v. Akzo Nobel Coatings, Inc.*, 172 Wn.2d 593, 607, 260 P.3d 857 (2011).

Whereas the plaintiff must present testimony that the defending health care provider's breach of the standard of care resulted in injury, the law does not require the uttering of any talismanic words. We do not require experts to testify in a particular format but instead look at the substance of the allegations and the substance of what the expert brings to the discussion. *Leaverton v. Cascade Surgical Partners, PLLC*, 160 Wn. App. 512, 520, 248 P.3d 136 (2011). To require experts to testify in a particular format would elevate form over substance. *White v. Kent Med. Ctr. Inc.*, 61 Wn. App. 163, 172, 810 P.2d 4 (1991).

In excluding the testimony, the trial court relied on the absence of Dr. Lawrence Menendez's affirmative reply that he would ground his opinion on a reasonable degree of medical certainty. Nevertheless, when asked the key question with regard to causation, Dr. Menendez provided an opinion based on probability. When questioned by

35

Providence Physician Services, Dr. Menendez affirmed that he grounded his opinions on his medical expertise, education, and experience. The beginnings of Dr. Menendez's deposition established him as a premier expert on orthopedic oncology and allografts. From the sum of the testimony, one must conclude that Dr. Menendez's testimony of causation was based on reasonable medical probability. Conversely, Dr. Menendez rendered no speculative or conjectural opinions.

*White v. Kent Medical Center Inc.*, 61 Wn. App. 163 (1991) is illustrative. Two doctors testified that a vocal cord examination is required for a patient with a four to six week history of hoarseness. Neither physician expressly testified that the defendant physician violated the standard of care by failing to perform the examination. This court ruled that the two doctors' testimony sufficed to defeat a summary judgment motion in the medical malpractice suit. "Standard of care" language was not essential to the admissibility of the opinions. At issue in this appeal is whether the expert testified to reasonable medical probability not the standard of care. Nevertheless, the same principle of promoting substance over form controls our decision.

## Materiality of Risk

In addition to asserting a cause of action for professional negligence, Joshua Driggs alleges that Dr. Andrew Howlett failed to obtain his informed consent to the March 9, 2009 surgery. Driggs argues that Dr. Howlett should have warned him of the risks of leaving the allograft without hardware fixation. Howlett contends he warned

36

Driggs of the risks, so the jury needed to decide who told the truth. To bolster his claim of informed consent, Joshua Driggs sought to introduce testimony of Dr. Lawrence Menendez about the risks of omitting any fixation. The trial court disallowed the testimony on the ground that Dr. Menendez did not testify to any percentage of the risk and provided no statistics regarding fractures resulting from the absence of fixation. The trial court nonetheless, presumably based on testimony of Dr. Steven Graboff, allowed the jury to render a verdict on the informed consent claim. Driggs assigns error to the exclusion of Menendez's testimony.

Dr. Lawrence Menendez testified little about the risk from no fixation for the allograft and the little testimony may have been targeted more to the claim of medical malpractice than the lack of informed consent. Lawrence Menendez testified that, when removing hardware from an allograft, the surgeon wants to insert new hardware to minimize the risk of fracture. He further testified that "it is less likely" that the bone will fracture if the surgeon inserts fixation. Conversely, omitting fixation renders the bone "more likely" to fracture. We must decide whether this medical testimony is admissible for determining the materiality of a risk for an informed consent cause of action.

The doctrine of informed consent refers to the requirement that a physician, before obtaining the consent of his or her patient to treatment, inform the patient of the treatment's attendant risks. *Smith v. Shannon*, 100 Wn.2d 26, 29, 666 P.2d 351 (1983). The doctrine is premised on the fundamental principle that every human being of adult

years and sound mind has a right to determine what shall be done with his own body.

*Smith v. Shannon*, 100 Wn.2d at 29. A necessary corollary to this principle is that the

individual be given sufficient information to make an intelligent decision. *Smith v.*

*Shannon*, 100 Wn.2d at 29.

RCW 7.70.050 codifies the elements of a cause of action for informed consent.

The statute defines a "material fact" as one to which

> a reasonably prudent person in the position of the patient or his or
> her representative would attach significance [in] deciding whether or not to
> submit to the proposed treatment.

RCW 7.70.050(2). "Material facts" include:

> (a) The nature and character of the treatment proposed and
> administered;
> (b) The anticipated results of the treatment proposed and
> administered;
> (c) The recognized possible alternative forms of treatment; or
> (d) The recognized serious possible risks, complications, and
> anticipated benefits involved in the treatment administered and in the
> recognized possible alternative forms of treatment, including nontreatment.

RCW 7.70.050(3).

Case law adds flesh to the cause of action for informed consent. Under the

doctrine of informed consent, a health care provider has a fiduciary duty to disclose

relevant facts about the patient's condition and the proposed course of treatment so that

the patient may exercise the right to make an informed health care decision. *Stewart-*

*Graves v. Vaughn*, 162 Wn.2d 115, 122, 170 P.3d 1151 (2007); *Miller v. Kennedy*, 11

Wn. App. 272, 282-83, 522 P.2d 852 (1974), *aff'd*, 85 Wn.2d 151, 530 P.2d 334 (1975).

Nevertheless, a physician need not disclose every risk that could be disclosed, if only

because of the time required to disclose every remote risk. *Smith v. Shannon*, 100 Wn.2d

at 30 (1983); *Ruffer v. St. Frances Cabrini Hosp. of Seattle*, 56 Wn. App. 625, 632, 784

P.2d 1288 (1990). A physician only has a duty to disclose material risks. RCW

7.70.050; *Smith v. Shannon*, 100 Wn.2d at 31; *Seybold v. Neu*, 105 Wn. App. 666, 681,

19 P.3d 1068 (2001). The physician need only disclose risks of serious harm that are

reasonably foreseeable. *Smith v. Shannon*, 100 Wn.2d at 31. The duty to disclose

similarly attaches to recognized possible alternative forms of treatment and to the

anticipated results of the treatment proposed and administered. *Adams v. Richland*

*Clinic, Inc.*, 37 Wn. App. 650, 657, 681 P.2d 1305 (1984).

Parallel to the requirement of expert testimony in a medical malpractice suit, an

informed consent action usually demands medical expert testimony. In an informed

consent action, the patient must present expert testimony to prove the existence of a risk,

its likelihood of occurrence, and the type of harm in question. *Smith v. Shannon*, 100

Wn.2d at 34. To determine whether such a risk is material, courts engage in a two-step

analysis. First, the scientific nature of the risk must be ascertained, i.e., the nature of the

harm that may result and the probability of its occurrence. *Smith v. Shannon*, 100 Wn.2d

at 33. Second, the trier of fact must decide whether the probability of that type of harm is

a risk which a reasonable patient would consider in deciding on treatment. *Smith v.*

*Shannon*, 100 Wn.2d at 33.

Expert testimony is needed only for the first step of the informed consent two-step analysis. *Smith v. Shannon*, 100 Wn.2d at 33. The second step of this determination of materiality does not require expert testimony. *Smith v. Shannon*, 100 Wn.2d at 33. A jury armed with information as to the nature and materiality of the risk may determine whether a reasonable patient would desire such information. The jury, as laymen and laywomen, are equipped to place themselves in the position of a patient and decide whether, under the circumstances, the patient should have been told. *Smith v. Shannon*, 100 Wn.2d at 32; *Miller v. Kennedy*, 11 Wn. App. at 288-89 (1974); *Keogan v. Holy Family Hosp.*, 95 Wn.2d 306, 318, 622 P.2d 1246 (1980).

The trial court did not identify the rule of evidence employed to exclude Dr. Lawrence Menendez's testimony on informed consent. Instead, the trial court noted that Lawrence Menendez failed to assign a percentage to the risk of a fracture with the absence of fixation. We assume the trial court deemed Menendez's testimony about the likelihood of a fracture to be irrelevant to an informed consent cause of action. In turn, we presume that the court concluded that Menendez's testimony provided no assistance to the jury.

ER 702 governs competency of expert testimony. The rule reads:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or

40

education, may testify thereto in the form of an opinion or otherwise. Under ER 702, expert testimony is admissible if (1) the witness qualifies as an expert, and (2) the testimony is helpful to the trier of fact. *State v. Cauthron*, 120 Wn.2d 879, 890, 846 P.2d 502 (1993). Dr. Menendez's qualifications are not in dispute. Thus, the question we resolve is whether the trial court abused its discretion when it determined Menendez's testimony would not help the trier of fact.

Expert testimony by a qualified expert is admissible if it is helpful to the trier of fact. *State v. Cauthron*, 120 Wn.2d at 890. Under ER 702, expert testimony will be deemed helpful to the trier of fact only if its relevance can be established. *State v. Greene*, 139 Wn.2d 64, 73, 984 P.2d 1024 (1999). Expert testimony assists a jury if the testimony concerns matters beyond the common knowledge of the average layperson and is not misleading. *State v. Groth*, 163 Wn. App. 548, 564, 261 P.3d 183 (2011). Courts generally interpret possible helpfulness to the trier of fact broadly and will favor admissibility in doubtful cases. *State v. Groth*, 163 Wn. App. at 564; *Moore v. Hagge*, 158 Wn. App. 137, 155, 241 P.3d 787 (2010).

We conclude that Dr. Lawrence Menendez's testimony, that the failure to replace the fixation would likely lead to a fracture, would help a jury in understanding the risk of Dr. Andrew Howlett's omission of fixation after the March 9, 2009 surgery. The risk attended to the lack of fixation for the allograft is not information known to the layperson. Providence Physician Services cites no case that holds a medical expert may

41

not testify to a likelihood of a risk reaching fruition because the expert fails to assign a percentage to the risk. Nor do we find any Washington decision addressing this precise question.

In another context, this court held that whether the expert provides statistical support for an opinion goes to the weight and not the admissibility of the testimony. *Reese v. Stroh*, 74 Wn. App. 550, 564, 874 P.2d 200 (1994), *aff'd on other grounds*, 128 Wn.2d 300, 907 P.2d 282 (1995). In *Reese*, the defendant physician, in a medical malpractice action, sought to exclude testimony on causation from the patient's expert witness, under ER 702, on the ground that the expert failed to assign a percentage to the chance that the physician's negligence caused injury.

A New Jersey intermediate appellate court, in *Frost v. Brenner*, 300 N.J. Super. 394, 693 A.2d 149 (App. Div. 1997), addressed the question of whether a patient in an informed consent claim must present the statistical risk of a procedure. The appeals court reversed a trial court that dismissed the claim because the plaintiff failed to quantify the relevant risks. The New Jersey court reasoned that statistical evidence is not an indispensable requisite because the materiality of a risk is based on significance to the reasonable patient. *Frost*, 300 N.J. Super. at 405. This ratiocination applies in Washington because the Washington standard for informed consent is likewise based on the significance of a risk to a reasonable patient, rather than from the physician's standpoint. *Smith v. Shannon*, 100 Wn.2d at 32; *Miller v. Kennedy*, 11 Wn. App. at 288-

42

89 (1974); *Keogan v. Holy Family Hosp.*, 95 Wn.2d at 318 (1980). If statistical evidence is not a prerequisite for an informed consent claim, a medical expert should be allowed to testify without mentioning percentages or statistics.

Providence Physician Services faults Dr. Lawrence Menendez's testimony because Menendez declares that omitting fixation renders the bone "more likely" to fracture, but he does not contrast the possibility or probability of a fracture even with fixation. We consider this criticism to go to the weight of Menendez's testimony, not its admissibility.

Joshua Driggs argues that requiring statistical evidence would create an impossible task in his suit because none of the testifying physicians had omitted replacement hardware when removing hardware from an allograft. Since none of the witnesses omitted replacement fixation, none could testify to the percentage of cases when a lack of fixation resulted in a fracture. Of course, Driggs' argument fails to note that scores of physicians unrelated to this suit could have omitted replacement hardware and that literature might address the percentage of the risk. Nevertheless, since we rule in favor of Driggs on the issue on other grounds, we need not rely on this contention. We note, however, that Driggs' contention highlights a problem demanding statistical evidence when no reliable data exists to establish the risks of a medical procedure. Reliable data may regularly be absent in medical malpractice cases where a physician completely deviated from common practices. Although informed consent requires physicians to

43

inform patients of material risks before treatment, quantifying risks may require unreliable speculation when treatment is unique, even though the risks are material.

Once again we recognize the trial court holds discretion in admitting and excluding evidence at trial. Nevertheless, the court abuses discretion when basing an evidentiary ruling on a misinterpretation of law. The law does not require an expert to assign a percentage to the risk of which the patient claims the physician did not inform him. Thus, the trial court erred in excluding Lawrence Menendez's opinion on the likelihood of the risk of omitting fixation.

*Personal Opinions*

The trial court mentioned that some or all of Dr. Lawrence Menendez's opinions were personal judgments. In its brief, Providence Physician Services does not seek to affirm the trial court's evidentiary rulings on the ground that Menendez expressed personal views. We deem ourselves compelled to address the issue, nonetheless, in order to assist on remand.

Dr. Lawrence Menendez agreed, in cross-examination, that his opinions were his personal opinions. Providence Physician Services runs too far with the concession, however. The term "personal opinion" is fraught with ambiguity. Providence's position wrongly assumes that a professional opinion or an opinion shared widely by members of the medical community cannot also be the personal opinion of a medical expert witness. Some expert witnesses will not understand the distinction rendered by the law between a

personal opinion and an admissible opinion based on the witness's experience, training, and research. An effective cross-examiner, such as Providence Physician Services' counsel, could obtain an indulgence from most, if not all, expert witnesses that opinions formulated based on their education, knowledge as a practitioner, and reading of literature constitute their personal opinions.

An expert's personal opinion is insufficient to establish the recognized standard of care. *White v. Kent Med. Ctr. Inc.*, 61 Wn. App. at 172 (1991). This principle must be read in context, however. Washington cases insinuate that an expert's personal opinion is admissible if the opinion is also a professional opinion. The test for admissibility is met so long as the court may conclude from the testimony that the expert discussed general, rather than personal, professional standards and expectations. *Adams v. Richland Clinic*, 37 Wn. App. at 655-56 (1991). In the context of standard of care testimony, this court has allowed an expert's opinion as long as the opinion is "more than a personal opinion." *White v. Kent Med. Ctr.*, 61 Wn. App. at 172. It is only necessary that an expert's opinion on the standard of care be based on general professional standards, rather than "mere" personal opinion. *Leaverton v. Cascade Surgical Partners PLLC*, 160 Wn. App. at 520 (2011). Thus, a personal opinion may be impermissible only if idiosyncratic to the expert witness. A personal opinion may be inadmissible only if not shared by the expert's professional community.

45

Foreign cases refer to "subjective opinions" of the expert as being impermissible.

*Boyd v. State Farm Ins. Cos.*, 158 F.3d 326, 331 (5th Cir. 1998); *Russell v. Call/D, LLC*,

122 A.3d 860, 867 (D.C. 2015); *Padilla v. Loweree*, 354 S.W.3d 856, 863 (Tex. App.

2011). Otherwise, so long as a physician with a medical degree has sufficient expertise

to demonstrate familiarity with the procedure or medical problem at issue, ordinarily he

or she will be considered qualified to express an opinion on any sort of medical question.

*White*, 61 Wn. App. at 173 (quoting 5A KARL B. TEGLAND, WASHINGTON PRACTICE:

EVIDENCE LAW AND PRACTICE § 290(2), at 386 (3d ed. 1989)).

*Pop Kwock Eng v. Klein*, 127 Wn. App. 171, 110 P.3d 844 (2005) is illustrative.

The plaintiff's expert physician testified:

> So *my personal opinion* would be that as a neurosurgeon, [Dr. Klein]
> should be very familiar with the signs and symptoms, diagnosis and
> treatment of meningitis. Now, that's not to say that he may not need to call
> in an expert to help him decide on exactly which antibiotics to choose and
> how long to treat them. That would be fine. But as far as recognizing the
> possibility of meningitis and knowing that a lumbar puncture is necessary
> to diagnose the meningitis, and to recognize that timely treatment is
> necessary in order to optimally improve the outcome of that patient, he
> should be aware of that, *in my opinion*.

127 Wn. App. at 178-79 (emphasis added). This court did not directly address the

expert's couching his testimony in the words of a "personal opinion." We nonetheless

accepted the testimony as admissible to show the professional standard of care to which

the defendant physician was held.

46

The record shows that opinions formulated by Dr. Lawrence Menendez were not "mere personal" or "subjective" opinions. Menendez is an experienced and noted orthopedic oncologist who presents papers at professional meetings. He was conversant with the national standard of care concerning fixation for allografts. In answer to questions on the standard of care, he spoke of his experience and presentations. He delivered articulate explanations for his opinions.

Providence Physician Services also reads too much into Dr. Menendez's concession. When asked if the opinions expressed were his personal opinions, Menendez responded, "technically, I'm offering my opinion." CP at 1411. He added that he grounded his views on his "knowledge and expertise and education and experience." CP at 1411.

A wealth of American case law supports a rule that only subjective or idiosyncratic personal opinions are impermissible and other personal opinions of an expert witness are admissible. Perhaps recognizing the ambiguity in the phrase "personal opinion," Texas law declares that an expert witness, as opposed to a lay or fact witness, may render a personal opinion. *United Way of San Antonio, Inc. v. Helping Hands Lifeline Found., Inc.*, 949 S.W.2d 707, 713 (Tex. App. 1997); *Lum v. State*, 903 S.W.2d 365, 369-70 (Tex. App. 1995); *Regal Petrol. Corp. v. McClung*, 608 S.W.2d 276, 278 (Tex. Civ. App. 1980); *Williams v. Hemphill County*, 254 S.W.2d 839, 842 (Tex. Civ. App. 1952). In Louisiana, an expert, who by education or experience has a unique

47

knowledge of the subject matter at issue, is permitted to express personal opinions. *Barrett v. T.L. James & Co.*, 28, 170 (La. App. 2 Cir. 4/3/96); 671 So. 2d 1186, 1194; *cert. denied*, 96-1124 (La. 6/7/96); 674 So. 2d 973; *Blitz v. Jefferson Parish Hosp. Serv. Dist. No. 2*, 93-733 (La. App. 5 Cir. 4/14/94) 636 So. 2d 1059.  In Florida, an expert's personal opinion need not meet the *Frye* test for admissibility.  *Rickgauer v. Sarkar*, 804 So. 2d 502, 504 (Fla. Dist. Ct. App. 2001).

In *Ward v. Dale County Farmers Co-op, Inc.*, 472 So. 2d 978, 978-79 (Ala. 1985), the reviewing court affirmed the trial court's admittance of testimony of a county agent concerning the cause of a low quality of crop.  The agent referenced his opinion as a personal opinion, but the opinion was based on his experience as an agricultural agent.  In *Arkansas State Highway Commission v. Union Planters National Bank*, 231 Ark. 907, 915, 333 S.W.2d 904 (1960), the appellate court affirmed the trial court's admission of an expert witness on land values, despite mention that the opinion was a personal opinion.  The court wisely noted that the opinion of any expert is of course personal to that witness.

This admissibility of personal opinions of an expert witness is not limited to southern states.  In *Joyce v. Boulevard Physical Therapy & Rehabilitation Center, PC*, 694 A.2d 648, 655 (Pa. Super. Ct. 1997), the trial court concluded that the expert testimony provided by one physician did not address the course of conduct that an average orthopedic surgeon would undertake during the course of the patient's treatment,

but rather contained the witness' personal thoughts about the standard of care. The trial court excluded testimony because the plaintiff's expert testified in the first person when articulating the standard of care and he testified to his personal opinion, rather than an objective standard of care. The appeals court disagreed that the expert testifying in the first person transformed his elicitation of the standard of care into his personal opinion. The expert's opinion was admissible since it was based on his experience and training as an orthopedic surgeon.

*Jury Instructions*

Joshua Driggs also contends that he is entitled to a new trial because the trial court refused to instruct the jury that Physician's Assistant Brandi DeSaveur was an agent of Providence Physician Services. Providence argues that the instructions were proper because Driggs never alleged negligence by DeSaveur in his complaint. In turn, Driggs contends he placed Providence on notice of his protest about DeSaveur's performance.

Providence Physician Services also contends the trial court committed no error by denying use of a jury instruction naming Brandi DeSaveur because no competent expert testified that DeSaveur breached the duty of care of a physician's assistant. Joshua Driggs responds that Graboff was competent to testify regarding Brandi DeSaveur's standard of care and he criticized her for failure to notice the fracture. In turn, Providence contends that Dr. Graboff, as a physician, was not qualified to testify to the standard of care of a physician's assistant. Joshua Driggs argues that DeSaveur

49

negligently performed a task that only an orthopedic surgeon should perform and that

Providence should not be able to disclaim DeSaveur's actions by holding her to a lower

standard of care. Neither party cites a case that addresses whether a physician may testify

to the standard of care of a physician's assistant or whether anyone other than a

physician's assistant may testify to the standard of care of a physician's assistant.

We have granted Joshua Driggs a new trial on other grounds. Therefore, we

decline to address issues surrounding the assignment of error concerning instructing the

jury with regard to negligence of Brandi DeSaveur. Principles of judicial restraint dictate

that if resolution of another issue effectively disposes of a case, we should resolve the

case on that basis without reaching the second issue presented. *Wash. State Farm Bureau*

*Fed'n v. Gregoire*, 162 Wn.2d at 307 (2007); *Hayden v. Mut. of Enumclaw Ins. Co.*, 141

Wn.2d at 68 (2000).

On remand, each party may request the trial court for instructions or relief as to

whether or not the question of Brandi DeSaveur's conduct should be an issue for the

second trial and whether or not Brandi DeSaveur should be listed on a jury verdict as an

actor of Providence Physician Services. We also decline to address what standard of care

to impose on a physician's assistant. The parties should first thoroughly brief and

analyze this issue with the trial court.

No. 32381-1-III
*Driggs v. Howlett, M.D.*

CONCLUSION

We vacate the judgment entered in favor of Providence Physician Services and Dr. Andrew Howlett. We remand for a new trial with directions to permit Dr. Lawrence Menendez to testify to his opinions of the standard of care, causation, and the extent of the risk in leaving the allograft unattached to fixation.

Fearing, C.J.

WE CONCUR:

Siddoway, J.

Korsmo, J.

51